**AMELIOTEX, INC.**

v.

**UNITED STATES.**

**C.D. 4673; Court No. 71–10–01429.**

United States Customs Court.

Nov. 19, 1976.

Rode & Qualey, New York City (John S. Rode and Michael S. O'Rourke, New York City, of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D.C. (John A. Gussow, New York City, trial atty.), for defendant.

RE, Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain Sarlane elastomeric fiber, invoiced as "Spandex Elastomeric Multi-Filament Yarns."

The merchandise, imported from Belgium in 1970, was classified as a monofilament under item 309.03 or 309.06 of the Tariff Schedules of the United States [TSUS], as modified by T.D. 68–9, depending on the denier of the fiber (not presently at issue), and assessed with duty, respectively, at the rate of 35 or 24 percent ad valorem.

It is plaintiff's contention that the imported yarn consists of strands which are not monofilaments, as classified by the cus-

toms officials, but rather multifilaments, or grouped filaments, which have not been subjected to such processes as twisting and untwisting, false twisting, crimping, and curling. Hence, plaintiff protests the classification, and claims that the merchandise is properly dutiable at the rate of 14.5 percent ad valorem under item 309.31, as modified by T.D. 68–9.

The tariff schedules in schedule 3, part 1, subpart E, headnote 3 contain the following pertinent definitions:

"(b) the term '*monofilaments*' embraces single filaments (including single filaments of laminated construction or produced from two or more filaments fused or bonded together), whether solid or hollow, whether flat, oval, round, or of any other cross-sectional configuration, which are not over 0.06 inch in maximum cross-sectional dimension;

\*    \*    \*    \*    \*    \*

(e) the term '*grouped filaments    .  .*' embraces two or more filaments    .  . grouped together with the filaments .  .  .   substantially parallel and not twisted, but the term does not include grouped filaments which have been subjected to processes such as twisting and untwisting, false twisting, crimping, and curling, and which are useable as yarns;"

Items 309.03 and 309.06 of the tariff schedules, pursuant to which the merchandise was classified, provide as follows:

"Monofilaments (in continuous
form) with or without twist,
whether known as monofils,
artificial horsehair, artificial
straw, yarns, or by any other
name:
Not over 150 denier:

\*    \*    \*    \*

309.03          Valued over 80 cents
per pound  . . . . . . . 35% ad val.
Over 150 denier:

\*    \*    \*    \*

309.06          Valued over 85 cents
per pound  . . . . . . . 24% ad val."

Plaintiff claims that the merchandise is dutiable pursuant to item 309.31 which provides:

"Grouped  filaments    .    .    .    (in
continuous  form),  whether  known
as  tow,  yarns,  or  by  any  other
name:
Wholly  of  grouped  filaments
(except  laminated  filaments
and plexiform filaments):

\*    \*    \*    \*

Other:

\*    \*    \*    \*

309.31          Valued over 80 cents
per pound  . . . . . 14.5% ad
val."

"Sarlane," the trade name of plaintiff's product, is a "spandex" fiber noted for its elastomeric properties, i. e., the ability to stretch and recoil with a high and rapid recovery. It is used particularly in foundation garments, waistbands, sportswear, and sport hosiery.

Whether Sarlane yarn consists of "monofilaments," as classified by the customs officals, or "multifilaments" or "grouped filaments," as claimed by plaintiff, is a question of first impression before this court. In the last analysis, its determination depends upon the technical factual data presented. In large measure, the court's finding is based upon its evaluation of the expert testimony of the witnesses. More specifically, the decision must be grounded upon what occurred during the production or manufacture of Sarlane, and particularly in the drying process. In view of the importance of the expert testimony, and the technical aspects of the production of Sarlane, it will be necessary to summarize the evidence in some detail.

The record consists of the testimony of five witnesses, three called by the plaintiff, and two by the defendant. Of the seventeen exhibits in evidence, eight were introduced by plaintiff, and nine by defendant.

It must be noted, at the outset, that the statutory definition of "monofilaments" set forth in headnote 3(b) is not limited to single filaments, but also includes single filaments "produced from two or more filaments fused or bonded together." It is, therefore, inconclusive to assert that Sarlane consists of individual filaments. The important question is whether the filaments have been "fused" or "bonded." Apart

from the definitions submitted by the expert witnesses who testified in this case, reference has been made to the various technical dictionaries that define these words. *Bonding* is described as a method of pressing fibers into thin sheets or webs that are held together by adhesive chemicals. See *Fairchild's Dictionary of Textiles* 71 (1967); *Encyclopedia of Textiles* 501 (1969). *Fused* is defined by *Webster's Third New International Dictionary* 925 (1961) as "melted together: united by heating . . reduced to liquid by heat; MOLTEN." The *Encyclopedia of Textiles* 508 (1969) also defines "fuse" as "[t]o melt with the application of heat."

By their pleadings, the parties have narrowed the issue presented, and have agreed that Sarlane is neither of laminated construction, nor plexiform filaments, nor strips over 0.06 inch, but less than one inch in width, and not over 0.01 inch in thickness. The parties have also agreed that the merchandise is valued at over 80 cents per pound.

The question presented, therefore, is whether plaintiff has borne its burden of proof that Sarlane should have been classified as a multifilament or grouped filament, rather than a monofilament as found by the customs officials. Under the pertinent tariff provisions, it is clear that plaintiff cannot succeed unless it can prove that the filaments in the Sarlane fiber have not been fused or bonded together so as to constitute a monofilament. If a fusing or bonding has occurred, the imported merchandise has been correctly classified and the protest must be denied.

Dr. Timothy V. Peters, founder and president of plaintiff corporation, holds a doctorate from Rutgers University for majors in physical and analytical chemistry, and has nearly nineteen years experience in research, development, and production of spandex fibers. He holds U.S. Patent No. 3,699,205, and the Belgian and Japanese equivalents which cover the process he invented for the manufacture of Sarlane fiber. A Belgian company, Fabelta, Division of U.C.B., and a Japanese company, Fuji Spinning Company, Ltd., have been licensed to produce Sarlane under Dr. Peters' patents. The merchandise at bar is representative of the Sarlane produced in Belgium.

Plaintiff introduced into evidence a schematic process flow chart to describe the patented method of production of Sarlane in Belgium. It was used by Dr. Peters to describe the process from its basic raw materials, through a reaction producing polyurethane in solution, to extrusion of the fully reacted product through a spinnerette whereby ten groups of filaments, eighteen filaments to a group, are produced. He explained how the individual filaments are lead through extraction baths to extract the solvent, gathered into groups of eighteen, dried to remove any individual water, lubricated as a group to prevent sticking together, wound onto packages, inspected and shipped to customers. Dr. Peters also contrasted this wet spinning process, by which Sarlane is produced, with three other manufacturing processes for the production of spandex fibers.

The testimony reveals that the melting point of Sarlane is between 240 and 245 degrees centigrade, and that during its production process, Sarlane is not exposed to temperatures greater than 190 to 195 degrees centigrade. Dr. Peters testified that at 195 degrees centigrade, reached during the drying process, Sarlane filaments are capable of "flow and creep." Predicated upon this testimony, the defendant, in its post-trial brief, submits that this phenomenon indicates that the filaments have been fused. Plaintiff explains that the terms "flow" and "creep," as used by Dr. Peters, only indicate the potential of the Sarlane molecules to flow by one another "inside the individual filament itself," in a time-independent process to relieve internal stress. Dr. Peters testified that Sarlane "does not melt at all in the process of manufacture" permitting each individual filament to maintain the "same outward appearance" during this phenomenon. He added that elastomeric products such as Sarlane do have, however, a "natural tack" which causes the eighteen individual filaments to remain in a group rather than coalesce. He

attributed this to the low modulus of the filaments which permits a maximum area of surface contact.

Dr. Peters asserted that the eighteen filaments in a strand of Sarlane could be separated by hand manipulation. Having testified that "two or three separate filaments" had been separated from the strand, he stated that with time he could separate all eighteen. He explained the fact that the separate filaments could not be put together after being pulled apart by the inability to achieve "the same degree of surface contact or of surface congruency that existed before I broke them [the filaments] apart."

Defendant, in its brief, contends that this "breaking experiment" proves the defendant's position, i.e., that Dr. Peters "could only break . . . [the strand] into three coalesced bundles . . . . Rather than separating the spandex fiber at issue . . . Dr. Peters . . . caused the fiber to *rupture*, precluding any concept of mere separation of separate fibers."

Dr. Samuel J. Golub, an expert witness called by plaintiff, specializes in fiber analysis, research in fabric defects, and related textile studies. He holds bachelor's and master's degrees in biology from the University of Massachusetts, and a doctorate from Harvard. He is presently the assistant director of Fabric Research Laboratories, Dedham, Massachusetts, the largest independent textile research laboratory in the United States.

From his examination of the Sarlane elastomeric fiber with both "light" and scanning electron microscopes to determine its morphology, Dr. Golub testified that the structure of Sarlane fiber is innately multifilament, and that there is no merging or mixing of material from one filament to another. He, therefore, concluded that there is no fusion between filaments. Nonetheless, Dr. Golub admitted that Sarlane filaments are lightly cohered at points along the length of the individual filaments. Although he stated that the points of coherence constitute only a very small percentage of the surface area, it is significant to note that he also stated that at these points there is true coherence. Dr. Golub added

that he found no foreign material or different molecular material between filaments as there is in bonding.

A photomicrograph of the broken end of one strand of Sarlane yarn, which had been immersed in liquid nitrogen and broken, revealed to Dr. Golub that the individual filaments "act independently because . . . they break at different levels." Another photomicrograph of a direct end view of a strand was partially out of focus. This apparently was due to the higher level of breakage of some filaments as compared to others of the same strand. Dr. Golub was convinced, therefore, that the filaments are cohered only very slightly.

To explain the concept of "coherence" or cohesion, Dr. Golub described two very finely polished plates of steel known in the metallurgical trade as Johanson blocks. Since cohesion is the attraction of molecular forces of the same kind of molecules, the molecular attraction between the two smooth surface areas of the steel plates must be very strong. In fact, Dr. Golub explained, "if you put them together you can't pull them apart. You have to slide them apart." He concluded that the same attraction accounts for the tendency of Sarlane filaments to remain in one group which, admittedly, is a desirable characteristic in multifilament yarns. Dr. Golub posited that due to the low modulus and softness of Sarlane, molecular attraction exists across the flattened interfaces of the individual filaments, and gives true coherence. He admitted, however, that one hundred percent coherence between filaments would result in a monofilament.

Dr. Golub testified that the points of coherence comprise only one percent of the surface area of a fiber, and that these points were very far apart permitting the material in between to extend a great deal. Therefore, if one wishes to bend the Sarlane strand, "there is ample distance for stretch and curvature without involving other filaments." Permitting a short section of Sarlane a few inches long to hang over his finger, Dr. Golub noted the good draping quality, stating that this is peculiar

to a multifilament fiber rather than a monofilament. He explained that in the multifil "the only element which is being stretched really is the single fiber at the very outside of the curvature, with the radius of curvature different from that on the inside, and the individual filaments have room to move and adjust. That is the reason a multifil bends down so easily." He added that a monofilament spandex, such as Vyrene, is stiff due to its monofil character, and does not exhibit the draping quality characteristic of Sarlane.

Dr. Monroe Couper, called as an expert witness on behalf of defendant, received the degrees of bachelor of science and chemistry, master of science, and doctorate degree at the University of Virginia where his doctoral thesis related to organic chemical structure and reaction mechanisms. At present senior research chemist in textiles at the du Pont Company, Dr. Couper has been in the field of polyurethane and spandex fiber structure, preparation, and processing for over fifteen years. At a time when Dr. Peters was also employed by the du Pont Company, Dr. Couper served as supervisor in the field of spandex polymer research.

While agreeing with Dr. Golub that "not a high percentage of the circumference" of the filaments is stuck together, Dr. Couper disagreed that the points of contact are "cohered." Rather, he testified that the filaments at these points are "coalesced, which is to become unitary. . . . [T]he matter flows from one [filament] to the other. . . . That is coalescence. And bonding, very clearly, is used in this sense and fusion is used loosely in this sense."

Dr. Couper testified that the chemical composition common to all spandex fibers is polyurethane, and that the structure of the molecule consists of alternating hard and soft segments along the same polymeric chain. "The consequences are that you have, in the soft material, what could be thought of as springs and you have, in the hard material, where it has come together into clumps, the equivalent of knots or fastening points among these strings or springs. As a result of this, when you pull on the structure, you have a high degree of stretch and, when you let go, the springs recoil and you have a high and rapid recovery. This is the essential element of spandex structure which accounts for its properties."

Dr. Couper commented upon Dr. Peters' discussion of "natural tack," and pointed out that the "tackiness" of Sarlane spandex is particularly evident during the heated drying process. Dr. Couper stated that the "molecules have, at the end or edge of the fiber, an unsatisfied bond or unsatisfied forces . . . [s]o there is a concentration of unsatisfied or high force at the surface of most polymers and of this one [Sarlane] in particular because high bonding forces have been built into the hard segments."

Dr. Couper maintained that during the drying process of Sarlane, "virtually all of the requirements for what I would call autohesion are met in this oven." "Autohesion," he continued, "is the flowing together of like materials when they are brought in contact." The requirements for *autohesion* are:

(1) the presence of strong bonds at the surface of the molecule;

(2) mobility in the molecules so that these surfaces can move about a little bit and, if they begin to touch at some place, then the bondable sites can migrate a little bit and find each other;

(3) a clean surface.

Dr. Couper concluded that "[v]irtually all of the requirements are factors favoring autohesion which are all present," and the "result would be that the surfaces would affix themselves to one another so thoroughly that they would be essentially unitary, unified. The matter in one [filament] would be virtually continuous into another."

Dr. Couper arrived at this conclusion following an examination of scanning electron micrographs made of Sarlane, and received in evidence as a collective exhibit. Prior to examination in the scanning electron micro-

scope, the Sarlane yarn was, in some cases, frozen "by contact with dry ice, after which it was cut with the sharpest possible blade. . . ."

According to Dr. Couper, defendant's photomicrographs revealed "the merest traces or, in most cases, disappearance of what may have been an initial interface," between touching filaments. He testified that the filaments have become "very nearly unitary to a different degree here and there, so that we have bridges or bonded areas" between them. In his judgment, "autohesion . . . has occurred when these clean, mobile, and highly bondable surfaces have come together with enough degree of force and heat and mobility to cause an autohesion. . . .. I would say this is fused."

From his examination, Dr. Couper concluded that the filaments are also self-bonded, or joined "into a unitary material of materials of two substances, by their being sufficiently pressed or moved together, and having sufficient flow that the molecules can get within the usual distance apart at the interface. . . . It is not necessary to have a foreign or third material at the interface to cause self-bonding. Sufficient heat, sufficient solvent, sufficient softness, and some pressure will be adequate."

Another set of photomicrographs of Sarlane, prepared by freezing in liquid nitrogen and breaking mechanically rather than cutting, was introduced into evidence by defendant as a second collective exhibit. Although the filaments appeared to be independent, by breaking at different levels, Dr. Couper pointed out that they were connected by "little bridges where there is a continuation or continuum of matter," or "points of weld which, in my judgment, are far more than cohesion. The matter is unitary. It is coalescence." See Appendix "A" to this opinion. He stressed that at the bridge or point of weld, the "skin of one [filament] has become the skin of the other." It is at these "little fused bridges that . . . we get the . . . virtual disappearance in localized places of what was originally the interface between the single filaments . . . ."

A third collective exhibit of photomicrographs of Sarlane was introduced by defendant to illustrate "what happens when you try to tear the filaments from one another." When a separate filament is peeled back from the bundle, a membrane, described by Dr. Couper as "a web in the webfoot of a duck," occurs, and the common skin must be ruptured as a result. See Appendix "B" to this opinion. He commented that "these are the bridge structures which are so well coalesced or self-bonded that they are having to be ripped. . . . Grouped filaments don't have, in my experience, this firm a bonding or this flowing together of a bridge." He added: "I cannot make a single tear without finding it [the webbing phenomenon]."

To demonstrate how grouped filaments act independently, defendant introduced into evidence a card, prepared by Dr. Couper, which contained four strands of dacron zero twist thirty-four filament yarn, and one strand of Sarlane, all stretched across the card. When the card was bent, relieving tension from the taut strands, all the grouped filaments of the dacron strands visibly separated from one another. This "splaying out" effect did not take place, and was not observed in the Sarlane strand.

Dr. Couper also described a phenomenon known as "heat setting." He explained that although the true melting and decomposing point of the Sarlane polymer is 240 to 245 degrees centigrade, nevertheless, at temperatures of 190 to 195 degrees centigrade found in the dryer during Sarlane processing, a viscous flow occurs between filaments which permanently deforms them. He emphasized that the "beginning of viscous flow is the place where true coalescence, in its ultimate, takes place."

Dr. Couper testified that viscous flow, which results in a fusion or autohesion of Sarlane filaments at the points of weld, is brought about by the combined "effects of heat and slight pressure" found in the dryer during Sarlane production. "The yarn must be pulled up against gravity and must

be extended a little bit so that under the slight pressures that must occur there, and at these high temperatures . . . there will be a fluid-like flow."

The testimony of Dr. Couper, that Sarlane filaments experience pressure in the dryer, is consistent with that of Dr. Peters who stated that a "very minor amount of tension is put on the yarn" which is drawn vertically upward onto the transfer rolls in the dryer. Dr. Couper explained that "very little pressure would be needed [to fuse the filaments] at the temperatures that these filaments would reach and did reach in the dryer." It is also significant that Dr. Peters, in his discussion of "flow and creep" of the filament molecules at dryer temperatures, stated that "internal stress . . . built into the spandex . . . can be released at those temperatures."

Dr. Golub, called by plaintiff in rebuttal, was critical of the manner in which some of defendant's photographs were prepared. He testified that the skin lines of the filaments photographed by Dr. Couper were "obscured by drag of the material or melt of the material over the skin line by the knife edge" when the samples were cut with a knife. He asserted that "[y]our knife blade will melt . . . the material because of the frictional heat . . . of the edge of the blade" so that "cutting is a melting process." He also attempted to explain that the inability to perceive skin lines in such scanning electron microscope photos was due to the fact that the "scanning electron microscope only shows you the surface" of a cross-section, and that "[y]ou cannot see down through it." He stated that when he performed change of focus studies with "transmitted light," he found a "skin line at every one of those junction points [between filaments]." Although Dr. Golub attempted to show that the skin lines at the points of weld or bridges preclude fusion, he nevertheless admitted that "you cannot photograph that transmitted light through and see it clearly."

Dr. Golub disagreed with Dr. Couper that the bridges or points of weld in defendant's photomicrographs represent coalescence of any kind. He did, however, agree with Dr. Couper that "this material pulls out like chewing gum." He denied that self-bonding occurs between Sarlane filaments at the stick points, and attempted to explain the reasons for the "stick points," "bridges," "web" or "duck's web." He added that bumps or asperities on the otherwise smooth filament surfaces "come in contact, and the surfaces at that contact point flatten out and cohesion occurs, then you will have, if you move . . . the filaments apart again, this chewing gum-like stretching out."

Regardless of the reasons or explanation for the phenomena, it is clear that Dr. Golub could not deny the existence of the "stick points," "bridges," or "webs."

In addition to the expert testimony that shows "fusion," defendant stresses that "the balance of the spandex trade in the United States recognizes and indeed treats the subject class of spandex as a monofilament." In support of its position, the defendant cites the "authoritative standard text in the field of spandex fibers" by Dr. R. W. Moncrieff, entitled *Man-Made Fibres* (1970), and the definition of elastomeric monofilament of the American Society for Testing Materials.

Defendant also emphasizes that fusion, i. e., autohesion and coalescence, between filaments takes place under the favorable conditions that exist in the dryer during the production of Sarlane. These conditions, enumerated by defendant in its brief, include:

(1) the presence of strong molecular bonds;

(2) the substantial heat applied in the drying chamber;

(3) the "tackiness" of the spandex surfaces in clean state; and

(4) the slight pressure exerted upon the fiber in the production process.

Although the temperature in the dryer does not exceed 190 to 195 degrees centigrade, Dr. Couper testified that at temperatures within fifty degrees of the melting and decomposing point of the polymer, viscous

flow can occur nonetheless. As previously noted, this concept known as "heat setting" is a phenomenon which makes fusion or autohesion possible below the melting and decomposing point of Sarlane.

Dr. Couper's testimony was confirmed by defendant's photomicrographs of cross sections of Sarlane yarn prepared by breaking in liquid nitrogen. These photomicrographs are free from Dr. Golub's criticism relating to distortion caused by cutting yarn samples with a knife, or in a microtome for microscopic examination. One such photomicrograph clearly reveals "little bridges or points of weld" connecting the Sarlane filaments. See Appendix "A."

It is at this bridge or point of weld that, when a filament is peeled back from the main bundle, there appears a web between filaments. See Appendix "B." As explained by Dr. Couper, "these are the bridge structures which are so well coalesced . . . that they are having to be ripped." Defendant's photomicrographs of filaments torn from one another clearly show this webbing phenomenon.

Although plaintiff believes the contrary, its own photograph, Appendix "C" to this opinion, fails to establish that fusion does not occur between Sarlane filaments. Pointing to the encircled portions of the photograph, Dr. Golub attempted to indicate a skin line between adjacent filaments. The two squares or blocks on that same photograph, however, show no discernible or visible skin lines. Notwithstanding Dr. Golub's assertion that faint lines exist, it is clear that at least at these points the filaments are not independent but are manifestly fused.

■ In customs classification cases, it is fundamental that plaintiff bears the dual burden of proving that the classification ascribed to the merchandise by the customs officials is wrong, and that the plaintiff's claimed classification is correct. The presumption of correctness rests on firm judicial authority. In the past it enjoyed statutory dignity only in reappraisement cases. Since 1970, it was incorporated into the Customs Courts Act of 1970 and is now expressly made applicable "[i]n any matter in the Customs Court."

■ In *United States v. New York Merchandise Co., Inc.*, 435 F.2d 1315, 58 CCPA 53, C.A.D. 1004 (1970), the Court of Customs and Patent Appeals reaffirmed and emphasized the importance of the presumption of correctness, and the dual burden that must be borne by the plaintiff. By a preponderance of the evidence, it is the plaintiff who must persuade the court that the Customs classification is wrong and that the claimed classification is correct. *United States v. New York Merchandise Co., Inc., supra; Technical Tape Corp. v. United States*, 55 CCPA 38, C.A.D. 931 (1968). In the language of the *New York Merchandise* case, it is plaintiff who must bear "the ultimate burden of persuasion." 58 CCPA at 58.

■ What is obvious, that customs classification cases are seldom free from all doubt, has on occasion been specifically articulated. *Vilem B. Haan et al. v. United States*, 67 Cust.Ct. 104, C.D. 4260, 332 F.Supp. 182 (1971). From an evidentiary standpoint, whether plaintiff in a particular case has borne the dual burden of proof is often a difficult and close question. *Automotive Tire Service, Inc. v. United States*, 66 Cust.Ct. 305, C.D. 4208 (1971). In the case at bar, the specific question presented is whether plaintiff has established or persuaded the court, that the "Sarlane" spandex fiber has been erroneously classified under the tariff provision for "monofilaments," and that it should have been properly classified under the provision for "multifilaments," or "grouped filaments." Notwithstanding the competent and thorough presentation, the plaintiff has not succeeded in meeting its dual burden. It is, therefore, the determination of this court that its claim must fail.

In order to prevail, it was incumbent upon plaintiff to establish that "Sarlane" consisted of "multifilaments" or "grouped filaments," and not "monofilaments" within the meaning of the Tariff Schedules of the United States. As was indicated previous-

ly, the statutory definition of "monofilaments" is not limited to single filaments, but "embraces," i. e., includes single filaments "produced from two or more filaments fused or bonded together." The crucial question, therefore, is not whether "Sarlane" is a single filament, i. e., "a monofilament," but rather, whether it is "produced from two or more filaments fused or bonded together."

After a careful study of the exhibits and the expert testimony, the court has concluded that the individual filaments in "Sarlane" have been fused or bonded together in the process of its production.

The expert testimony described the manufacture or production of Sarlane. It cannot be doubted that the drying process is of special importance. Although the witnesses agreed upon the nature of the process and the filaments, they differed on the precise effect of the process upon the filaments, and whether it caused or constituted a "fusing" or "bonding."

Some of the testimony left the impression that the words "fused" or "fusion" were studiously avoided. From some of the testimony of plaintiff's witnesses, the fusion of the filaments in the production of Sarlane was not enough because it occurred at only a small percentage of the surface area. On this crucial phase of the case the court accepts the testimony and conclusion of Dr. Couper that the filaments have been fused.

Much of the testimony that deals with "viscous flow," "flow and creep," "tackiness," "webbing," "breaking," "fastening points" and the like is best explained by Dr. Couper. The court finds his testimony plausible and credible, and fully supported by the exhibits.

The president of plaintiff corporation, Dr. Peters, and Dr. Golub, who supported his testimony, were vigorous in their view that the filaments were neither fused nor bonded. They were unable, however, to deny those factors or phenomena that caused Dr.

Couper, defendant's expert, to testify that the filaments were "coalesced," "unitary," "unified" or "fused." Notwithstanding the various labels designed to describe what occurred to the filaments in the drying process of the production of Sarlane, such as "natural tack," "points of weld," "fastening points," "stick points" or "web," it would seem clear that the filaments were thereafter no longer independent filaments.

It may be well to add that plaintiff's reliance upon the example of the Johanson blocks is misplaced, since it does not answer the question whether Sarlane filaments were fused or bonded together during production. In the drying process of Sarlane, the filaments are subjected to temperatures which cause a "flow and creep" or "viscous flow." As a consequence, one filament cannot be removed or separated from another without causing a "webbing" or "tearing." On the other hand, the Johanson blocks upon separation remain intact and fully independent.

The defendant did not merely rely upon the presumption of correctness that attaches to the classification of the customs officials. It came forward with credible and reliable evidence in support of the classification of the merchandise. Since the court is in agreement with the factual conclusions submitted by the defendant's expert, it is clear that plaintiff has not borne its burden of proof.

On the record before the court, after a careful study of the testimony of the witnesses and the exhibits, it is the determination of the court that plaintiff has not succeeded in proving that Sarlane was a multifilament, i. e., grouped filaments, as claimed, and not a monofilament, as classified.

In view of the foregoing, the protest is overruled and the classification is sustained.

Judgment will issue accordingly.

Appendices to follow.

APPENDIX A
Defendant's Exhibit E,
Photomicrograph #4.

"SARLANE" 280 DENIER
SEM – BUNDLE BROKEN IN LIQUID N₂ 4000X

APPENDIX B
Defendant's Exhibit F,
Photomicrograph #4.

"SARLANE" 280 DENIER
SEM – BUNDLE SEPARATED BY PULLING
APART BY HAND – 400X

APPENDIX C
Plaintiff's Exhibit 7,
Photomicrograph D.

Sarlane, 70 denier
SEM – 1530X