**PERMAGRAIN PRODUCTS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 81–12–01644.

United States Court of International Trade.

Sept. 4, 1985.

Montgomery, McCracken, Walker & Rhoads (Craig E. Ziegler, Philadelphia, Pa., at the trial and on the brief), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch (Judith M. Barzilay, New York City, at the trial and on the brief), for defendant.

RE, Chief Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from Canada, and described on the customs invoice as "unfinished hardwood flooring blanks."

The merchandise was classified by the Customs Service as "other hardwood flooring" under item 202.60 of the Tariff Schedules of the United States (TSUS). Consequently, the merchandise was assessed with duty of 6.8 per centum ad valorem.

Plaintiff protests this classification and contends that the merchandise is properly classifiable under item 202.42, TSUS, as "hardwood lumber, rough, dressed or worked" free of duty.

The pertinent statutory provisions of the tariff schedules are as follows:

Classified Under:

Schedule 2, Part 1:

> Wood flooring, whether in strips, planks, blocks, assembled sections or units, or other forms, and whether or not drilled or treated (except softwood flooring classifiable as lumber):
>> Hardwood flooring in strips or planks, whether or not drilled or treated:

. . . .

202.60    Other ............................................... 6.8% ad val.

Claimed Under:

Schedule 2, Part 1:

Subpart B headnotes:

(a) <u>Lumber:</u>  A product of a sawmill or sawmill and planing mill derived from a log by lengthwise sawing which, in its original sawed condition, has at least 2 approximately parallel flat longitudinal sawed surfaces, and which may be rough, dressed, or worked, as set forth below:

(i) <u>rough lumber</u> is lumber just as it comes from the saw, whether in the original sawed size or edged, resawn, crosscut, or trimmed to smaller sizes;

(ii) <u>dressed lumber</u> is lumber which has been dressed or surfaced by planing on at least one edge or face; and

(iii) <u>worked lumber</u> is lumber which has been matched (provided with a tongued-and-grooved joint at the edge or ends), shiplapped (provided with a rabbeted or lapped joint at the edges), or patterned (shaped at the edges or on the faces to a patterned or molded form) on a matching machine, sticker, or molder.

. . . .

Lumber, rough, dressed or worked (including softwood flooring, classifiable as lumber, but not including siding, molding and hardwood flooring):

Hardwood:

202.42　　Oak (Quercus spp.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . free

---

The question presented is whether, within the meaning of the competing tariff provisions, the imported merchandise is dutiable as "hardwood flooring [other than] in strips or planks, whether or not drilled or treated," with a duty rate of 6.8 per centum ad valorem, as classified by Customs, or "[hardwood] lumber, rough, dressed or worked," free of duty, as claimed by plaintiff. It must be noted at the outset that the claimed classification expressly excludes "siding, molding and hardwood flooring." Consequently, if the imported hardwood flooring blanks are "flooring" within the meaning of item 202.60, the Customs classification is correct and the protest must be denied. In order to decide this issue, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed.Cir. 1984).

After a careful examination of the merchandise, the exhibits, testimony of record, and relevant case law, it is the determination of the court that the plaintiff has not overcome the presumption of correctness that attaches to the government's classification. *See* 28 U.S.C. § 2639(a)(1) (1982); *Jarvis Clark Co. v. United States, supra;* *E.R. Hawthorne & Co. v. United States,* 730 F.2d 1490, 1490 (Fed.Cir.1984).

The imported merchandise consists of wood parquet flooring tiles or blanks comprised of seven or eight small slats of red oak. These slats, measuring approximately ⅜ inch thick by ⅞ inch wide and 6⅜ inch long, are assembled by means of two wire splines inserted into grooves cut into the underside of the blank. Each blank measures approximately 6½ by 6½ inches.

In attacking the Customs Service's classification of the hardwood flooring blanks, it is the plaintiff's principal contention that item 202.60 must be construed in light of the *Tariff Classification Study* (1960), which states that "other" wood flooring "includes short strips of accurately milled wood." Plaintiff argues that the blanks are not "accurately milled." It asserts that, since they cannot be used as flooring, they are properly classifiable as lumber.

In order to determine whether the imported flooring blanks are properly classifiable as hardwood flooring, the court must ascertain the meaning of "other" hardwood flooring, classifiable under item 202.60 of the TSUS. It is well established that tariff terms are to be construed in accordance with their common and commercial meanings. *See Nippon Kogaku (USA), Inc. v. United States,* 69 CCPA 89, 92, 673 F.2d 380, 382 (1982). Likewise, it is clear that the "common meaning of a tariff term is not a question of fact, but a question of law." *Schott Optical Glass, Inc. v.*

*United States*, 67 CCPA 32, 34, C.A.D. 1239, 612 F.2d 1283, 1285 (1979).

The tariff schedules are written in the language of commerce, and the terms used are to be given their commercial or common meaning. *See Ameliotex, Inc. v. United States*, 65 CCPA 22, 25, C.A.D. 1200, 565 F.2d 674, 677 (1977). Accordingly, the court may consider expert testimony adduced at trial to determine whether the wood blanks are hardwood flooring. Also, it is well to remember that representative samples of the merchandise may be "potent" witnesses. *Marshall Field & Co. v. United States*, 45 CCPA 72, 81, C.A.D. 676 (1958). As an aid in determining the meaning of a tariff item, the Tariff Classification Study may also be consulted. *See, e.g., Rifkin Textiles Corp. v. United States*, 54 CCPA 138, 141, C.A.D. 925, *cert. denied*, 389 U.S. 931, 88 S.Ct. 294, 19 L.Ed.2d 283 (1967); *see Izod Outerwear v. United States*, 9 CIT —, Slip Op. 85–72, at 5 n. 4 (July 23, 1985). The pertinent provision of the study states:

> Item 202.60 covers "other" wood flooring .... This flooring is in blocks, assembled sections or units, or other forms, and *includes short strips of accurately milled wood*, either separate, in sets, or assembled in sections for parquet and similar types of patterned floors.

*Tariff Classification Study, Explanatory Notes and Background Materials, Schedule 2*, at 22 (1960), *reprinted in 1 Tariff Classification Study* 166 (1963) (emphasis added).

At trial, six witnesses testified, four for the plaintiff and two for the defendant. In addition, numerous exhibits were introduced, including representative wood blanks at varying stages of manufacture.

Plaintiff's first witness was Mr. A.E. Witt, president of the plaintiff corporation since it was formed in 1977. He has been in the acrylic flooring industry since 1968, and is the holder of several patents regarding the manufacture of acrylic wood products and flooring. Mr. Witt described the processing of the merchandise prior to importation. He testified that the lumber used to manufacture the merchandise originates in Pennsylvania where it is cut into one-inch thick boards. It is then shipped to Canada where it is kiln-dried. Subsequently, the large boards are ripped to the proper size and cut into blocks. The blocks are planed on two sides before being sawed into small slats or fillets. Finally, the slats are joined by means of two wire splines embedded on the underside of the slats perpendicular to their length. Mr. Witt testified that, in his opinion, the imported merchandise had progressed approximately halfway through a finished wood floor production line.

Mr. Witt also described in detail the plaintiff's manufacturing process after importation. The blanks are placed in a vacuum to extract the air from the wood's pores. Through an impregnation process, the pores are filled with liquid acrylic. Through irradiation, the acrylic is hardened, and the blanks are trimmed to dimension and assembled into 12- by 12-inch tiles. The plaintiff employs several sanding and buffing steps, as well as conditioning, to finish the parquet tile that it sells. Mr. Witt also testified that the cost to plaintiff of the merchandise as imported is approximately seventy-five cents per square foot. Processing the blanks after importation adds approximately one dollar and twenty-five cents per square foot to the cost. Mr. Witt stated that plaintiff uses the wood blanks for flooring except for the manufacture of some novelty items. He was personally aware that others made use of the blanks for making furniture and wall covering. He was unable to state the definition of "accurately milled" within the meaning of the wood flooring industry. He did testify, however, that, according to his company's requirements, the blanks were not accurately milled.

On cross-examination, Mr. Witt testified that in prior business dealings he had referred to parquet flooring blanks like the imported merchandise as "flooring." He also testified that the merchandise as imported could be laid on the floor without

sanding or finishing but that, in his opinion, it would first have to be sized.

Plaintiff also submitted the testimony of three expert witnesses. Plaintiff's first expert was Mr. Thomas D. Waller, a self-employed salesman of flooring products. Mr. Waller has been in the wood flooring business for approximately ten years. On direct examination, Mr. Waller stated that he was unaware of specific industry standards concerning the words "accurately milled." On cross-examination, he admitted that the imported merchandise could be called a wood flooring blank. He also testified that, at the very least, the merchandise would need only to be sized or squared prior to installation. Sanding and finishing could be performed after installation.

Plaintiff's next witness was Mr. Richard Fedor, employed by Fedor & Company since 1958, and its president since 1975. Fedor & Company is primarily an industrial flooring contractor and has been in the wood flooring business since 1947. Mr. Fedor testified that the imported product would need to be squared prior to installation. He stated that he had also seen wood blanks used in the construction of tables and in wall installations. On cross-examination he testified that he would describe the merchandise as a prefinished flooring blank.

Plaintiff's final witness was Mr. Joseph Covington, who has been in the wood flooring business for 36 years, and is currently the president of Covington Flooring Company of Birmingham, Alabama. He testified that, in his opinion, the merchandise could not be used as flooring as imported. Although he was personally aware of uses made of the wood blanks in installations other than flooring, he stated that it would need to be sized before use as flooring. He also stated that he would call the imported merchandise untrimmed, unfinished flooring.

The defendant called two expert witnesses. The first was Mr. Lawrence Barrett, an expert in the field of acrylic flooring manufacture for approximately twenty years. He holds over twenty United States and foreign patents, principally in the field of acrylic wood flooring manufacturing. He is currently the president of the Applied Radiant Energy Company (ARECO), a manufacturer of acrylic wood flooring materials. ARECO is a member of the American Parquet Association, and, through a subsidiary, also sells non-acrylic wood flooring materials.

During Mr. Barrett's testimony, the defendant produced numerous exhibits, including a parquet blank manufactured by ARECO which is substantially similar to the imported merchandise. Mr. Barrett testified that he considered the ARECO parquet blank to be flooring and not lumber. He also testified that the importation would not commonly be referred to as "lumber" in the flooring industry, and that it was far removed from lumber because of the amount of work that had been performed. Mr. Barrett stated that the slats used to produce parquet blanks such as the imported product are "accurately milled," and that any usage other than flooring constitutes less than approximately two percent of total use.

Mr. Barrett testified that the ARECO flooring blanks are marketed in three ways. The first is as acrylic impregnated flooring, similar to the plaintiff's. The second is by simply squaring and surface finishing the blanks before installation. The third is by selling the unsquared, unsized blanks without further preparation or processing. Using a sample of the plaintiff's imported merchandise, he demonstrated a pattern of installation known as the "straight-line" or "soldier" pattern. He testified that the imported merchandise could be laid directly on the floor with an adhesive. Any cracks that developed could be filled and the floor could be sanded and finished after installation. Such a floor would be inexpensive but would also be, in his opinion, a very attractive finished floor.

The defendant's second expert witness was Mr. Albert Duke, the owner and president of the Peace Flooring Company of Magnolia, Arkansas. He has been in the lumber business since 1942 and in the floor-

ing business since 1950. Mr. Duke has also been the president of the American Parquet Association since 1978. He has taught courses in various aspects of hardwood flooring installation and has personally installed floors for customers.

Mr. Duke testified that the imported merchandise would be called a parquet flooring block, and that he considered the plaintiff's merchandise to be accurately milled. He was firm that under no circumstances would it be called "lumber" in the flooring industry, stating that the product stops being lumber and begins to be flooring when it is made into slats. He also testified that although there are many uses for the merchandise other than flooring, they constitute a very small percentage of its use nationwide.

During Mr. Duke's direct examination, the defendant introduced into evidence a parquet flooring blank manufactured by Mr. Duke's firm. The blank was similar to the merchandise imported by the plaintiff. Instead of using a wire spline assembly, however, the slats are held together with paper facing. Using this exhibit, Mr. Duke demonstrated the "straight line" pattern of installation previously demonstrated by Mr. Barrett. Mr. Duke testified that the merchandise imported by the plaintiff could also be laid in such a configuration without further modification.

Mr. Duke stated that Peace Flooring Company sells a parquet tile known as its straight-line product. During this testimony, the defendant established by means of brochures that a straight-line product was also sold by other manufacturers. He testified that, in a straight-line pattern floor, the units would not need to be sized prior to installation. He stated that after attachment to the floor surface with an adhesive, any cracks could be filled and the floor could then be sanded and finished. He added that the imported merchandise would require neither sizing, sanding, nor finishing prior to installation.

In support of plaintiff's assertion that the blanks as imported cannot be used as flooring, Mr. Witt testified that, in his opinion, for the blanks to be accurately milled, they would have to comply with the dimensional tolerances contained in two industry publications. The first publication, sponsored by the American Parquet Association, is entitled *NBS Voluntary Product Standard PS 27–70,* and deals with "Mosaic-Parquet Hardwood Slat Flooring." This pamphlet was released in 1970 by the United States Department of Commerce for the National Bureau of Standards (NBS). The tolerance listed for each blank is "plus or minus ¹⁄₃₂ inch in length or width." In 1984, this pamphlet was superseded by the *American National Standard for Floors and Flooring—Mosaic-Parquet Hardwood Slat Flooring,* also sponsored by the American Parquet Association, which adopted this same tolerance rating. The exhibits indicate, and the testimony confirms, that the imported merchandise did not conform to this tolerance level.

Plaintiff's witness, Mr. Witt, stated on cross-examination that he did not know who sponsored the voluntary standards, nor was his company a member of the American Parquet Association.

Defendant's witness, Mr. Duke, president of the American Parquet Association, testified that the standards are not used in the industry for the day-to-day manufacturing of the blanks, but are used to settle claims in case they arise. More significantly, he testified that the imported hardwood flooring blanks would be considered "accurately milled" in the industry.

Expert testimony as to the common meaning of a tariff term is, of course, merely advisory. *E.g., Package Machinery Co. v. United States,* 41 CCPA 63, 66, C.A.D. 1200 (1953). It is, however, considered probative, particularly if it is supported by technical sources. *See NEC America, Inc. v. United States,* 8 CIT ——, 596 F.Supp. 466, 471, *aff'd,* 760 F.2d 1295 (Fed.Cir.1985). In this case the "technical" source relied upon by the plaintiff's expert has been shown to be of limited relevance to the industry meaning of "accurately milled." Indeed, Mr. Witt testified that he wouldn't "try to speak for the wood floor-

ing industry." Nevertheless, he stated his opinion that blanks are considered accurately milled when their tolerances are less than ⁵⁄₁₀₀₀'s of an inch. Under the circumstances, that conclusory statement is entitled to little, if any, probative value. *See, e.g., Keer, Maurer Co. v. United States,* 46 CCPA 110, 115, C.A.D. 710 (1959).

■ In this case, the defendant did not merely rely on the statutory presumption of correctness that prevails in customs classification cases. It introduced persuasive expert testimony to refute the testimony of plaintiff's witnesses, and to prove that the merchandise was properly classified by Customs. *See Schott Optical Glass, Inc. v. United States,* 82 Cust.Ct. 11, 24, C.D. 4783, 468 F.Supp. 1318, 1326, *aff'd,* 67 CCPA 32, C.A.D. 1239, 612 F.2d 1238 (1979); *Ameliotex, Inc. v. United States,* 77 Cust.Ct. 72, 84, C.D. 4673, 426 F.Supp. 556, 564 (1976), *aff'd* 65 CCPA 22, C.A.D. 1200, 565 F.2d 674 (1977). The presumption of correctness that attaches to the government's classification applies to all subsidiary facts necessary to sustain the classification. *United States v. New York Merchandise Co.,* 58 CCPA 53, 58, C.A.D. 1004, 435 F.2d 1315, 1318 (1970). A subsidiary fact on the issue of whether the slats are "other hardwood flooring" is whether they are accurately milled. Upon the record adduced at trial, it is the holding of the court that the plaintiff has not overcome the presumption of correctness that attaches to the Customs classification.

The *Tariff Classification Study* indicates that it is the slats or strips of wood which comprise the blanks, rather than the blanks themselves, that must be accurately milled. Indeed, the study indicates that the short strips of wood would be considered flooring even if "separate, in sets, or assembled in sections." *Tariff Classification Study, Explanatory Notes and Background Materials, Schedule 2,* at 22 (1960), *reprinted in 1 Tariff Classification Study* 166 (1963). Through its expert witnesses, the defendant has introduced persuasive evidence that the slats which comprise the merchandise at bar are accurately milled. On all of the evidence presented, it is the conclusion of the court that the imported hardwood blanks are accurately milled within the meaning of the Tariff Act.

The court must now determine whether the blanks are "other" hardwood flooring. The plaintiff asserts that an article of wood remains lumber until it has been so far processed as to "become" the article for which the lumber was intended. *See A.N. Deringer, Inc. v. United States,* 61 Cust.Ct. 66, 72, C.D. 3530, 287 F.Supp. 1016, 1021 (1968) (citing *United States v. C.S. Emery & Co.,* 18 CCPA 208, 211, T.D. 44399 (1930) (stair rails that needed only to be cut to size properly classified as manufacture of wood)). Plaintiff argues that the imported hardwood flooring blanks "clearly fall within the category of 'dressed lumber,'" defined in the Tariff schedules as lumber which "has been dressed or surfaced by planing on at least one edge or face." *See* Schedule 2, Part 1, Subpart B headnote 2(a)(ii), TSUS.

It is undisputed that the slats are planed "on at least one edge or face." Thus, it is recognized that the slats fit within the description of "dressed lumber" pursuant to the headnotes to Subpart B of Schedule 2, Part 1 of the TSUS. Indeed prior to enactment of the Tariff Act of 1930, ch. 497, 46 Stat. 590 (1931), wood used for floors was classified as "dressed lumber," *see, e.g.,* Tariff Act of 1894, ch. 349, para. 676, 28 Stat. 509, 546 (1895); *United States v. Dudley,* 174 U.S. 670, 673, 19 S.Ct. 801, 802, 43 L.Ed. 1129 (1899); or as "lumber not further manufactured than sawed, planed, and tongued and grooved," *see, e.g.,* Tariff Act of 1922, ch. 356, para. 1700, 42 Stat. 858, 932 (1923); *United States v. Mitsui & Co.,* 17 CCPA 67, 72, T.D. 43359 (1929).

In paragraph 402 of the Tariff Act of 1930, Congress added "flooring" as an independent tariff provision. *See* Tariff Act of 1930, ch. 497, para. 402, 46 Stat. 590, 629 (1931); United States Tariff Commission, *Comparison of Tariff Acts* 70 (1934). *See generally D.B. Frampton & Co. v. United*

*States,* 60 Cust.Ct. 4, 13–14, C.D. 3243 (1968) (comparing flooring provisions of Tariff Acts of 1922 and 1930). Item 202.60 was derived from paragraphs 402, 404, and 412 of the Tariff Act of 1930. *See Tariff Classification Study, Schedule 2, Part 1,* at 22 (1960). In view of this history, the Court must ascertain whether the "unfinished hardwood flooring blanks" are "flooring" within the meaning of the TSUS, or whether they are raw materials for manufacturing flooring. "The crucial question in all cases is to determine which of the competing provisions has requirements which are more difficult to satisfy and which describes the article with the greatest degree of accuracy and specificity." *Amersham Corp. v. United States,* 5 CIT 49, 66, 564 F.Supp. 813, 824 (1983); *see, e.g., Arthur J. Humphreys, Packard-Bell Electronics v. United States,* 56 CCPA 67, 69, C.A.D. 956, 407 F.2d 417, 419 (1969); *United States v. Mitsui & Co.,* 17 CCPA 67, 72, T.D. 43359 (1929).

In support of its argument, the plaintiff relies chiefly on *A.N. Deringer, Inc. v. United States,* 61 Cust.Ct. 66, C.D. 3530, 287 F.Supp. 1016 (1968). In *Deringer,* the imported merchandise consisted of wedge-shaped wooden articles, called "horsefeathers," which were used as a backing on the side or roof of a building in order to make the surface flat or level prior to installation of the roofing material. Plaintiff contended that the imported merchandise was properly classifiable as rough spruce lumber, rather than as "articles of wood, not specially provided for" as classified by Customs. Defendant argued that "if a new and different product emerges which has a different name, character, or use from its predecessor, it is a manufacture," and no longer is material. *Id.* at 71, 287 F.Supp. at 1019.

The United States Customs Court held that, although the imported product was useful for only one purpose, the horsefeathers were "merely one of the materials used in resurfacing roofs and sides of buildings. Hence, they were not 'the thing itself.'" *Id.* at 73, 287 F.Supp. at 1021. It is clear that *Deringer* merely follows a

long line of judicial authority which holds that "if the lumber has been processed to the extent that *it itself* became the article for which the material was intended, then it is dutiable as a manufacture of wood and not as lumber." *Id.* at 72, 287 F.Supp. at 1021 (emphasis in original); *see, e.g., United States v. Dudley,* 174 U.S. 670, 674, 19 S.Ct. 801, 802, 43 L.Ed. 1129 (1899); *United States v. C.S. Emery & Co.,* 18 CCPA 208, 211, T.D. 44399 (1930), *construed in Border Brokerage Co. v. United States,* 69 Cust.Ct. 130, 136, C.D. 4383, 349 F.Supp. 1011, 1015–16 (1972); *F.W. Myers & Co. v. United States,* 69 Cust.Ct. 30, 33, C.D. 4370, 345 F.Supp. 1006, 1008 (1972).

In *Border Brokerage Co. v. United States,* 69 Cust.Ct. 130, C.D. 4383, 349 F.Supp. 1011 (1972), the United States Customs Court had occasion to explain and apply the general rule that lumber may be processed to the extent that it ceases to be material and becomes a new article of commerce made from lumber. *See. id.* at 135–38, 349 F.Supp. at 1015–16. In *Border Brokerage Co.,* the imported merchandise consisted of three pieces of dadoed or grooved wood, which comprised a "dadoed doorjamb set." Plaintiff contended that "the doorjamb sets should properly have been classified as lumber." Defendant maintained that the imported articles had been properly classified as articles of wood "not specially provided for." The United States Customs Court held that the merchandise was "not lumber because it has been so manufactured as to have ceased to be a material. It has become the article itself, i.e., a dadoed doorjamb set.... In summary, in the language of the courts, it is no longer lumber as a material for the making of an article, but is the article or thing itself." *Id.* at 138, 349 F.Supp. at 1016.

In this case, it is clear that the blanks are to be used as flooring. In addition, although the plaintiff alleges that the blanks are not in a condition suitable for use as flooring, the defendant introduced credible and persuasive affirmative testimony to show an alternate method of installation

which would enable the blanks to be used in their present condition. Moreover, it is significant to note that prior judicial decisions have determined that wood chiefly used for flooring is properly classifiable as flooring. *See, e.g., Davies, Turner & Co. v. United States*, 65 Cust.Ct. 337, 341, C.D. 4099 (1970); *Mitsui & Co. v. United States*, 56 Cust.Ct. 267, 270, C.D. 2636 (1966). In view of the clear testimony and the demonstrations, the court holds that the imported hardwood blanks have been processed or manufactured to the extent that they have ceased to be lumber, and are "flooring" within the meaning of item 202.-60 of the TSUS.

Plaintiff asserts that the wood blanks must be lumber because they cannot be used as flooring in their condition as imported. This assertion was refuted by both of the defendant's experts. Even if it is assumed that the blanks need to be sized or squared prior to installation, however, the blanks are, at the very least, unfinished flooring. Their classification in item 202.-60, TSUS, would thus be required by virtue of 19 U.S.C. § 1202 General Headnotes and Interpretive Rules 10(h) (1982), which provides:

> (h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished....

The imported merchandise was clearly identified as flooring in its condition as imported, and, indeed, was described on the invoice as "unfinished hardwood flooring blanks." Furthermore, in addition to both of the defendant's experts, even plaintiff's expert, Mr. Covington, identified the imported product as untrimmed, unfinished flooring. An imported product will be classified as an article rather than material when the identity of the actual article can be discerned from an examination of the product, *Bendix Mouldings, Inc. v. United States*, 73 Cust.Ct. 204, 205, C.D. 4576, 388 F.Supp. 1193, 1194 (1974), *appeal dismissed*, 62 CCPA 109 (1975), and when the identity of actual articles can be seen

emerging from undifferentiated material. *American Import Co. v. United States*, 26 CCPA 72, 75, T.D. 49612 (1938). Upon examination of the unfinished hardwood flooring blanks, one can clearly discern and identify the hardwood blanks as flooring.

In *F.B. Vandegrift & Co. v. United States*, 55 CCPA 24, C.A.D. 928 (1967), small rectangular pieces of glass were classified as "laboratory articles." The importer protested, claiming that the glass was properly classifiable as "sheet glass, by whatever process made and for whatever purpose used." The imported merchandise measured approximately 76 by 26 millimeters and $\frac{3}{64}$-inches thick. The importer converted the glass into microscope slides by grinding the glass into dimensions of 75 by 25 millimeters, with a plus or minus .04-millimeter tolerance. The United States Court of Customs and Patents Appeals held that the "partially manufactured" miscroscope slides were properly classified. The court noted that the imported glass was the approximate size of the finished product, and agreed with the Customs Court that trimming the glass, although necessary to make the product suitable for the ultimate consumer, did not require a finding that the glass remained raw material. *Id.* at 27.

The issue presented in this case is substantially similar to that in *F.B. Vandegrift & Co.* The wood flooring blanks are designed and intended to be used for wood flooring. Assuming that the blanks as imported would not be suitable for immediate use, the act of trimming the blanks to size does not warrant a finding that they are lumber rather than hardwood flooring. *See also United States v. Nylonge Corp.*, 48 CCPA 55, 61–63, C.A.D. 764 (1960).

The decision in *B.A. McKenzie & Co. v. United States*, 47 CCPA 42, C.A.D. 726 (1959) does not require a different holding. In *B.A. McKenzie & Co.*, the court held that "doorskins," plywood panels designed and sold as face panels for doors, were properly classified as plywood rather than as manufactures of wood. In that case, however, there was a great deal of evi-

dence to demonstrate that the doorskins had commercial uses other than the manufacture of doors. That is, they did not lose their character as plywood, and were used for the manufacture of gun racks, luggage, paneling, and kitchen cabinets. In this case, the percentage of the blanks used for other than flooring is *de minimis*.

In the *Summaries of Trade and Tariff Information*, which often has been relied on by this Court as an indicia of legislative intent, the section describing hardwood flooring states:

> The flooring provided for in item 202.-60 includes block flooring, which is generally of two types, unit or laminated. *Unit block flooring is made from short pieces of strip flooring (usually of hardwood) tightly fastened together (principally by splines) to form a square, customarily 9 × 9 inches and ²⁵⁄₃₂ inch thick with tongued-and-grooved edges....* Assembled sections or units of block flooring, also provided for in item 202.60, consist of (1) sets of an even number of squares (unit or laminated) fastened together so that the grain of each square forms a checkerboard or parquetry pattern in the completed panel, and (2) sets of "slat-block" flooring, each set made up of four or more smaller squares formed from narrow slats or strips.

*Summaries of Trade and Tariff Information, Schedule 2, Vol. 2*, at 117–18 (1967) (emphasis added). This statement clearly shows that the hardwood flooring blanks were intended to be included in item 202.60. The method of assembly is identical and the size is fairly similar. The absence of tongued-and-grooved edges is not a significant distinguishing feature. Thus, the hardwood blanks are more specifically described in the flooring provision. Accordingly, they are properly classified under item 202.60.

Based upon an examination of the imported "unfinished hardwood flooring blanks," testimony of record, and applicable legal authority, it is the determination of the Court that the merchandise at issue has been sufficiently processed to the point that it is no longer "lumber" and has become "flooring." Consequently, the plaintiff has not overcome the presumption of correctness that attaches to the government's classification that the imported merchandise is "other hardwood flooring."

Since the Court holds that the flooring blanks are properly classified under item 202.60 of the tariff schedules, plaintiff's claim is denied and the action is dismissed. Judgment will issue accordingly.