**KORES MANUFACTURING CORP., Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**Court No. 79–8–01338.**

United States Court of International Trade.

May 27, 1982.

---

**1304**

Barnes, Richardson & Colburn, New York City (Rufus E. Jarman, Jr. and Richard

Haroian, New York City, at the trial and on the briefs), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, New York City, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch (Barbara M. Epstein, Bellmore, N. Y., at the trial and on the brief), for defendant.

FORD, Judge:

This case presents the issue of the proper classification for customs duty purposes of certain merchandise invoiced as "Multistrike Plastic Film Ribbon", manufactured in Great Britain by Kores Nordic (G.B.) Ltd.

The merchandise was classified by Customs officials as other articles not specially provided for, of textile materials under item 389.62 of the Tariff Schedules of the United States (TSUS), with the rate of duty of 25 cents per lb. plus 15% ad valorem. Additionally, defendant submits as an alternative claim for classification as parts of typewriters, under item 676.50, TSUS, with rate of duty at 9.5% ad valorem.

Plaintiff contests the classification and maintains the merchandise should have been classified as other articles not specially provided for of plastics under item 774.60, TSUS, which provides for duty at 8.5% ad valorem. Alternatively, plaintiff contends said merchandise is properly dutiable under item 676.52, TSUS, as other parts of office machines and as such dutiable at the rate of duty at 5.5% ad valorem.

Together with the applicable headnotes and rules of interpretation, the following are the pertinent provisions of the Tariff Schedules of the United States.

Classified by Customs officials:

Schedule 3, Part 7. Miscellaneous Textile Products;

\*  \*  \*  \*  \*  \*  \*

Subpart B headnotes:

1. This subpart covers articles, of textile materials, not covered elsewhere in the tariff schedules.

Articles not specially provided for, of textile materials:

\*  \*  \*  \*  \*  \*  \*

Other articles, not ornamented:

\*  \*  \*  \*  \*  \*  \*

Other:

\*  \*  \*  \*  \*  \*  \*

389.62    Other ................25¢ per lb.
+ 15% ad val.

Plaintiff's claimed classification:

Schedule 7, Part 12.—Rubber and Plastics Products:

\*     \*     \*     \*     \*     \*     \*

Articles not specially provided for, of rubber or plastics:

\*     \*     \*     \*     \*     \*     \*

774.60 [1]    Other ................8.5% [2] ad val.

Or, alternatively

Schedule 6, Part 4,—Machinery and Mechanical Equipment Claimed Under:

> [Typewriters, addressing machines, etc., calculating machines, etc., and office machines not specially provided for]
>
> Parts of the foregoing:

Defendant's Alternative Claim:

676.50    Typewriter parts .....9.5% [3] ad val.

676.52    Other .............5.5% [4] ad val.

TSUS Schedule 4, Part 1, Subpart C headnotes:

3. The term "*plastics materials*" [in. item 405.25] [5] embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. The term includes, but is not limited to, phenolic and other tar-acid resins, styrene resins, alkyd and polyester resins based on phthalic anhydride, coumarone-indene resins, urethane, epoxy, toluene sulfonamide, maleic, fumaric, aniline, and polyamide resins, and other synthetic resins. The plastics materials may be in solid, semi-solid, or liquid condition, such as flakes, powders, pellets, granules, solutions, emulsions, and other basic forms not further processed.

GENERAL HEADNOTES AND RULES OF INTERPRETATION

9. *Definitions.* For the purposes of the schedules, unless the context otherwise requires—

\*     \*     \*     \*     \*     \*

(f) the terms "of", "wholly of", "almost wholly of", "in part of" and "containing", when used between the description of an article and a material (e.g., "furniture *of* wood", "woven fabrics, *wholly of* cotton", etc.), have the following meanings:

(i) "of" means that the article is wholly or in chief value of the named material;

\*     \*     \*     \*     \*     \*

10. *General Interpretative Rules.* For the purposes of these schedules—

\*     \*     \*     \*     \*     \*

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

\*     \*     \*     \*     \*     \*

(f) an article is in chief value of a material if such material exceeds in value each other single component material of the article;

\*     \*     \*     \*     \*     \*

(ij) a provision for "parts" of an article covers a product solely or chiefly used as

---

1. By virtue of Presidential Proclamation No. 4707 dated December 11, 1979, Item 774.60 was superseded by three new tariff items: 774.-45, 774.50, and 774.55. Item 774.55 is analogous to old item 774.60.

2. The current rate for item 774.55 is 7.7% *ad val.*

3. The current rate for item 676.50 is 8.1% *ad val.*

4. The current rate for item 676.52 is 5.1% *ad val.*

5. HEADNOTE 3 of Schedule 4, Part 1, Subpart C was amended by the Trade Agreements Act of 1979 (P.L. 96–39, 93 Stat. 144, 220). The only change relates to the bracketed item number. The bracketed section of the headnote currently provides: "in items 408.44 to 409.18, inclusive,".

a part of such article, but does not prevail over a specific provision for such part.

## HEADNOTES

*Schedule 3, Part 1, Subpart E*

2. (a) For the purposes of the tariff schedules, the term *"man-made fibers"* refers to the filaments, strips, and fibers covered in this subpart.

(b) Subject to the limitations set forth in Headnotes 1 and 3 of this subpart, the respective provisions in this subpart for filaments, strips, and fibers cover such articles whether they are formed by extrusion or by other processes from substances derived by man from cellulosic or non-cellulosic materials by chemical processes, such as, but not limited to, polymerization and condensation;

\* \* \* \* \* \*

3. For the purposes of this subpart—

\* \* \* \* \* \*

(d) the term "strips" embraces strips (including strips of laminated construction), whether or not folded lengthwise, twisted, or crimped, which in unfolded, untwisted, and uncrimped condition are over 0.06 inch but not over one inch in width and are not over 0.01 inch in thickness.

The record consists of the testimony of two witnesses called on behalf of the plaintiff and the admission into evidence of 21 exhibits. Defendant produced the testimony of two witnesses together with four exhibits. The official court papers and plaintiff's requests for admissions and defendant's response thereto were received in evidence as unmarked exhibits.

Mr. Melvin Goldman was called as plaintiff's first witness and testified that he is currently vice president and has been employed by the Kores Manufacturing Corp. for three years. He explained that although his basic duty is marketing, he is also familiar with the manufacturing and importing of the merchandise at issue. A multistrike plastic film ribbon is one which can be struck in almost the same place over and over again. The witness identified var-

ious styles and types of imported multistrike plastic film ribbons.

He testified plaintiff's exhibit 1 was a representative sample of the merchandise, which merchandise varied in style depending upon the individual customer's specifications. The imported merchandise is a multistrike plastic film ribbon $\frac{1}{4}$ to $\frac{5}{16}$ inches in width, 250 to 1,600 feet in length and .0095–.0012 inches in thickness.

The plastic film ribbons are designed to fit into cassettes which are used in the daisy printers of word processing systems. Plaintiff's exhibit 1 is a ribbon $\frac{1}{4}$ of an inch wide and 350 feet long with an adhesive takeup to keep ribbon from unraveling, a yellow cross hatch warning strip, a leader and a clear trailer. Differences in the construction of the various exhibits manifest the fact they are designed for use in different word processing systems. He testified he had often visited the premises of plaintiff's customers and observed the operations performed on the ribbons after importation. Some of his customers, he explained, opened the cassettes, refilled them with multistrike film ribbons and sold them to end users. Basically the imported film ribbons are sold to manufacturers of printers who in turn sell the printers to major companies that build word processing systems around them. The witness visited customers in New Jersey, California and Puerto Rico, where he observed the operations performed on the imported film ribbons. It appears each of plaintiff's customers has different expectations and specifications for the multistrike ribbons. The witness worked closely with his company's customers in designing the ribbons, drawing up specifications and determining the coating formulation. The multistrike ribbons are delivered to the customers in their imported condition. They are then loaded into cassettes. Plaintiff's exhibits 2, 4 and 6 are examples of multistrike film ribbons loaded into the cassettes by plaintiff's customers. Some of the differing characteristics of the ribbon include the coating, leaders, cross hatching and length. For one of his company's first customers, the witness testified he had visited

them over a hundred times for the purpose of adjusting the multistrike film properties to fit the customer's needs. A multistrike ribbon is a known article of commerce and is produced by at least one other company. Based upon his experience with ribbons for word processing systems, the witness testified to the differing types of coatings and materials used for single strike or correctible coatings and those materials and coatings used for multistrike ribbons.

The witness stated the multistrike ribbon was developed for use with a "daisy wheel printer" which is a part of a word processing system. Multistrike ribbons have a base film of tensilized polyester which is strong enough to permit repeated striking in almost the same spot without deforming the ribbon. The daisy wheel printer is one of the main components of a word processing system. The usual word processing system is composed of a cathode ray tube screen, a keyboard, a disk drive and memory, and a daisy wheel printer. The keyboard supplies data into the memory which may be monitored on a cathode ray tube screen. Material previously stored may, on demand, be transferred to paper by the printer using the daisy wheel. The daisy wheel printing system permits printing of fifty-five characters per second as compared to the conventional electric typewriter which types a maximum of twelve characters per second. The high velocity of a daisy wheel printing system necessitated the development of a new type of ribbon which could be struck more than once, would fit into the relatively limited space of the daisy wheel printer and provide an acceptable quality of print.

Mr. Goldman explained that a single strike ribbon may yield about 25,000 characters while a multistrike ribbon of the same length would yield about 133,000 characters. Accordingly, to use single strike ribbons in a word processing machine would require a frequent and unacceptable number of ribbon changes. In addition the polyethylene base used in a single strike ribbon requires greater space for the takeup side to contain the ribbon than the space required on the supply side of a cartridge.

He acknowledged under cross examination that defendant's exhibits A and B, typewriter correctible film ribbon, was similar to the imported multistrike ribbon to the extent they have leaders, cores, a round shape and a coated film. However, he differentiated the imported merchandise by its high quality, its formulated coating, and by its inability to fit directly into a word processing machine.

Mr. Goldman stated that the use of a word processing system as a typewriter would be a misuse since the features of the word processor would not be utilized. On redirect examination the witness explained that defendant's exhibit A, a single strike ribbon, has a thinner coating on a polyethylene base and is designed to totally transfer the ink for one character at a time. One of the differences between the imported article and defendant's exhibit B is that the imported merchandise is made from a more expensive polyester base material while exhibit B is made from a polyethylene base material. Exhibit B, he said, is a very simplistic cartridge without any gearing mechanism. It is made for a slow speed machine. In both the polyethylene ribbons and imported polyester film ribbon, the most expensive component is the film base of either polyester or polyethylene.

Plaintiff then called Anthony Jackson, the managing director of Kores Nordic (G.B.) Ltd. (hereinafter "Kores, U.K."), the manufacturer of the imported merchandise, and parent company of plaintiff Kores Manufacturing Corp. As managing director, he is responsible for manufacturing, accounting administration, sales, purchases, and other associated functions of a chief executive officer.

The witness testified that Kores, U.K. is a manufacturer of business products involving a wide line of office supplies including single strike ribbons, cloth ribbons and multistrike ribbons, as well as carbon paper and other related items.

Mr. Jackson stated he was familiar with the manufacture of film ribbons produced by his company. Initially the process be-

gins with a roll of polyester sheet 26½ inches wide, 12 thousand meters long, purchased from a supplier and known in the industry as jumbo rolls. The sheet is first treated with an undercoating and then a second coating. The undercoating contains solvents, resins and pigments. The materials for the coating are produced by Kores and then combined. The undercoating is applied to the sheet of polyester by a machine to enable the second coating to adhere to the polyester sheet base. After undercoating the film is dried and then the second coating is applied. The second or main coating material is a combination of ingredients such as oil, pigments, resins and solvents. After application the principal coating is machine dried. Not all jumbo rolls are treated alike, depending on customer specifications. The steps in processing include coating the jumbo roll, printing the yellow cross-hatching, and splicing the clear trailers and leaders to the roll. All of these operations are completed before the polyester sheeting is slit. The next step in the process is to thread the sheets into the slitting heads which in turn cut the film into the specified widths, after which the film is attached to the cores and wound to the appropriate length. In some situations where reflective tape is required, the tape is added to the jumbo rolls at the same time and in the same widths as the leader and trailer.

The witness identified and explained plaintiff's confidential documents, collective exhibit 16, which consist of Kores U.K. standard and actual costs and a compilation of costs for June 1978 prepared from the company's costs compilations. A third document, in collective exhibit 16, consists of a breakdown of the manufacturing process into six stages and the material costs, labor costs and overhead costs for each stage. The stages of manufacture are enumerated as follows:

(1) film carbon

(2) undercoat

(3) coat

(4) ends, i.e., leader, trailer, cross hatch and reflective foil

(5) slitting

(6) cores.

A nonconfidential version of exhibit 16 was also admitted into evidence as exhibit 17. It set forth the costs in terms of the percentages of the total of each class of costs. It is clear the cost of the polyester film as shown from plaintiff's exhibit 16 and 17 far exceeds the cost of all of the other components or materials. The polyester sheet is used because of its physical properties of strength, thinness and resistance to deformation under impact.

Mr. Jackson stated the word processing machines differ from typewriters since a typewriter stands alone while a word processing machine consists of a number of components. In its most simple terms, a word processing system would have a keyboard, cathode ray tube, a drive unit which houses a memory which gives signals to the system, and a printer. According to the witness the use of the imported ribbon on typewriters is not possible because they are designed to fit into specific word processing cartridges which are used in specific machines. This confirms the testimony of Mr. Goldman.

Defendant's witness, Richard Lutzer, Chief of the Textile Branch of the Customs Laboratories in New York, identified the sheet of polyester material included as part of plaintiff's exhibit 15 and described it as a plastic film and not a textile material because it did not meet the Tariff Schedule definition in terms of its dimensions for it to be textile materials. He also stated the IBM magcard machine is a typewriter with a memory.

Mr. Jackson, in rebuttal, testified that while magcard typewriters have a memory, he considers them as typewriters at the top end of the scale. There is a large gap between them and the power, sophistication, technique and price of a word processing system. A word processor is designed to have an editing function with total flexi-

bility to manipulate words, sentences or paragraphs. The word processor can take any letter, word, line, sentence, and by use of a keyboard manipulate those letters or words to form any order or shape without having to make a final hard copy. This is accomplished by displaying it on a cathode ray tube.

The imported multistrike ribbon was classified under the tariff provisions in terms of its composition. The General Headnotes to the Tariff Schedules of the United States provide guidance of how the terms are to be construed in the tariff schedules.

Thus a General Headnotes and Rule of Interpretation headnote 9(f)(i) provides in part that the term "of" when used between the description of an article and a material means, the article is wholly or in chief value of the named material. In this case it is plaintiff's obligation to refute the presumption of correctness attaching to the classification and prove the importation was not wholly or in chief value "of textile material", since it is plaintiff's claim that the multistrike film ribbon is in component material of chief value "of plastic", and it is plaintiff's burden to establish the imported merchandise to be in chief value of plastic. *Broadway-Hale Stores, Inc. v. United States*, 63 Cust.Ct. 194, C.D. 3896 (1969).

The proper method of determining chief value is to ascertain the costs of the separate component materials at the time when they have reached the state when nothing further need be done to them except combine them into the completed article. *United States v. Jovita Perez*, 44 CCPA 35, C.A.D. 633 (1957); *J. C. Penney Purchasing Corporation v. United States*, 77 Cust.Ct. 48, C.D. 4671 (1976).

While it is undisputed that the value of the materials should be determined when no further steps remain to be done to them, there is open in each case the determination of the issue as to whether or not that stage has or has not been reached. *United States v. Meadows*, 2 Ct.Cust.Appls. 143, T.D.

31665 (1911). *N. Erlanger Blumgart Co. v. United States*, 57 CCPA 127, 428 F.2d 860 (1970).

In *United States v. Bernard, Judae & Co.*, 15 Ct.Cust.Appls. 172, T.D. 42231 (1927), the court discussed the reason for the general rule for the determination of the component material of chief value. The court held the value of the materials of which an article is composed at the time when they are in a condition to be joined and nothing further remains to be done to them is controlling. The court made the following observation:

> * * * The uniting of the component materials to make the finished article is a labor bestowed upon the article itself and not upon the component material. These bristles were ready to become a part of the brushes before they were inserted in the handle. The insertion of the same, the binding them in place with wire staples, as the evidence shows was done, and the subsequent trimming all were labor upon the brush and not upon the bristles, within the meaning of the statute.

An examination of the record reveals the components which make up the imported articles include a roll of polyester plastic sheet 26⅛ inches in width, an undercoating and coating composed of solvents, resins, pigments, oil dyestuff and fibers as well as leaders, trailers, tapes and cores. Plaintiff's testimony indicates that the roll of plastic film is purchased in condition ready to unite it with the other component materials. The record establishes the cost of the plastic film constitutes 59.714 percent of all the material costs incurred in producing the imported plastic ribbon for the period of the importation.

At the point in time for determining component material in chief value, the imported article is not a textile material. The component material of chief value is the polyester plastic sheet in its uncut 26½ inch width. There is no dispute that the polyester sheet is a "plastic" within the scope of the Tariff Schedules of the United States.

It has been admitted by defendant in response to plaintiff's requests for admission that the polyester film is made from polyethylene terephthalate which is a polymer formed by the condensation of ethylene glycol and terephthalic acid which are organic chemicals.

Furthermore polyester film conforms to the definition of plastic materials contained in Headnote 3, Subpart C, Part 1 of Schedule 4.[6]

Conversely defendant's reason for classifying the imported ribbon as textile materials is the fact that the ribbons as imported conform to the dimensional specifications of "strips" as defined in Headnote 3(d), Subpart E, Part 1, Schedule 3.[7]

However, at the time for determining the component material in chief value, no such "strips" exist. They were sliced from the 26 inch jumbo roll during the final stage of production.

■ In the course of producing a jumbo multistrike sheet 26½ inches wide (coating, undercoating, etc.) further operations of cross-hatching, attachment of leader, trailer and reflective materials, etc. are performed before the sheet is slit to a width of under one inch. The slitting of the coated plastic sheet is not considered in determining the chief value since labor applied after it is at the point of combination is not a factor of chief value. *United States v. Fondeville & Von Iderstine*, 7 Ct.Cust. Appls. 135, T.D. 36457 (1916). An expression of this authority may be found in *United States v. Jovita Perez*, 44 CCPA 35, 39, C.A.D. 633 (1957):

It is obvious, taking into consideration the aforequoted explanation of the rule, that the rule, in fact, is not a departure from the plain language of the statute. At best, it is a means to implement this directive. In its effect, the rule does provide for the ascertaining of the value of each component material in its condition as found in the article, but implicit in the rule is a recognition of the fact that labor and skill applied to the component after combination with the other component materials, viz—to the entire mixture, cannot be attributed to said component taken alone.

*See also United States v. Johnson & Johnson*, 154 F. 39 (2nd Cir. 1907).

■ In the instant case the "strips" are not present when the other component materials were united to produce the imported articles. Thus, on the record it is concluded that the component material in chief value of the multistrike ribbons, at the time when the components are in such condition that nothing remains to be done except to combine them, is the plastic sheeting.

Having concluded that the merchandise is not "of textile materials" it is equally clear from the record that the "strips" are not articles *formed* by extrusion or other process within the language of Headnote 2(b) of Subpart E, Part 1 of Schedule 3.

The dispute moves to the question of whether the imported articles are more spe-

---

**6.** 3. The term *"plastics materials"* in item 405.25 * embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. The term includes, but is not limited to, phenolic and other tar-acid resins, styrene resins, alkyd and polyester resins based on phthalic anhydride, coumarone-indene resins, urethane, epoxy, toluene sulfonamide, maleic, fumaric, aniline, and polyamide resins, and other synthetic resins. The plastic materials may be in solid, semi-solid, or liquid condition, such as flakes, powders, pellets, granules, solutions, emulsions, and other basic forms not further processed.

The Trade Agreements Act of 1979 (P.L. 96–39, 93 Stat. 220) amended item number from "in item 405.25" to "in items 408.44 to 409.18 inclusive,".

**7.** 3. For the purposes of this subpart—

* * * * * *

(d) the term *"strips"* embraces strips (including strips of laminated construction), whether or not folded lengthwise, twisted, or crimped, which in unfolded, untwisted, and uncrimped condition are over 0.06 inch but not over one inch in width and are not over 0.01 inch in thickness.

cifically provided for as claimed by plaintiff as articles not specifically provided for of rubber or plastic, or as other parts of office machines under item 676.52, TSUS, or under defendant's alternative claim under item 676.50 as typewriter parts.

Headnote 1(iv) in Schedule 6, Part 4, excludes articles of textile materials from classification within this part.[8]

However, as it is established that this imported merchandise is not "articles of textile materials" the headnote does not exclude the involved merchandise.

Plaintiff contends the record conclusively establishes the imported merchandise is not subject to classification as typewriter parts, but is properly classifiable as parts of other office machines under item 676.52.

In resolving the issue plaintiff relies upon General Interpretative Rule 10(ij)[9] TSUS. Rule 10(ij) requires that a "part" of an article is a product solely or chiefly used as a part.

Chief use as set forth in General Interpretative Rule 10(e)(i) provides:

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

On the question of chief use it has long been held that importers and merchants have every incentive for knowing the uses to which their goods are or may be put.

*United States v. Baltimore & Ohio R.R. Co.*, 47 CCPA 1, C.A.D. 719 (1959); *Kubie & Co. v. United States*, 12 Ct.Cust.Appls. 468, T.D. 40668 (1925).

In this same vein this court has had occasion to point out that executives concerned with designing, framing specifications, ordering, importing, selling, distributing and promoting an article have to know its chief use and are of course competent to testify about them. *F. B. Vandegrift & Co. Inc. v. United States*, 56 Cust.Ct. 103, C.D. 2617 (1966); *Royal Cathay Trading Co. v. United States*, 56 Cust.Ct. 371, C.D. 2662 (1966). Turning to the present controversy, the testimony elicited at trial establishes that the imported film ribbons are used in office machines known as "printers". The testimony of Mr. Goldman and Mr. Jackson indicate they were concerned with the specifications, ordering, selling and distribution of the article.

Defendant asserts plaintiff has not proven that the multistrike ribbons involved herein are of the class chiefly used in office machines other than typewriters.

An examination of the definition contained in TSUS Schedule 6, Part 4, Subpart G provides the following definition of the term office machines:

Subpart G.—Office Machines

*Subpart G headnotes:*

*     *     *     *     *     *

2. For the purposes of this subpart—

(a) the term *"office machines"* refers to machines which are used in offices, shops, factories, workshops, schools, depots, hotels, and elsewhere, for doing work concerning the writing, recording, sorting, filing, mailing of correspondence, records, accounts, forms, etc., or for doing

**8.** 1. This part does not cover—

*     *     *     *     *     *

(iv) articles of textile materials; articles of stone, of ceramic ware, of glass, or of other materials provided for in schedule 5; or articles of leather or of fur on the skin * * *.

**9.** 10. *General Interpretative Rules.* For the purposes of these schedules—

*     *     *     *     *     *

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

other "office work", and which have a base for fixing or placing them on a table, desk, wall, floor, or similar place * * *.

The record is replete with facts establishing the imported film ribbons are used exclusively in office machines known as printers. The daisy wheel printers were developed as a result of advancing technology which permitted greater printing speed. Plaintiff has established that the imported multistrike ribbons serve by actual design and character as a part of a daisy wheel printer. The Tariff Schedules definition of "office machines" refers to "machines which are used in offices, shops, factories * * * and elsewhere, for doing work concerning the writing, recording, * * * mailing of correspondence". The conclusion is unmistakable that multistrike film ribbons are parts of office machines. It is noted a typewriter operates at a speed of 12 characters per second while the daisy wheel printer using the multistrike film ribbon may produce 55 characters per second. Such speed necessitates a film ribbon that can fit into a relatively small space, produce a quality printing, be struck repeatedly in the same space and not require frequent changing. These requirements were not met by either the cloth type ribbons or single strike ribbons. Thus the polyester base multistrike film was developed, and it filled the need for use in the high velocity daisy wheel printers. There is no dispute in the testimony that printers are not typewriters and the imported film ribbons are not typewriter ribbons. There are authoritative and persuasive statements in the record that the word processing system is much more than a typewriter. The capabilities of transferring words, lines, memory, screen display, and price are some of the distinguishing characteristics.

■ Chief use or even sole use in and of itself does not necessarily make an import a "part". *Robert Bosch Corp. v. United*

*States,* 63 Cust.Ct. 187, 305 F.Supp. 921 (1969). In order to be classified as a "part" the article must serve a useful function in relation to the main article and in some way contribute to the efficient or safe operation of that article. *Gallagher & Ascher Co. v. United States,* 52 CCPA 11, C.A.D. 849 (1964); *Victoria Distributors Inc. v. United States,* 57 CCPA 76, 425 F.2d 759 (1970). Thus, in the case at bar there is no doubt that by this measure a multistrike ribbon is a useful part of a printer, since it provides a hard copy of the material put into the word processing machine.

Moreover even though the merchandise may resemble a typewriter ribbon, they are more durable, efficient and suited only to the demands of high velocity printers used in word processing machines. Hence it is concluded from the undisputed evidence and the clear testimony of the witnesses that the imported film ribbons are parts of office machines.

From the foregoing it is equally apparent the imported film ribbons differ substantially in construction, efficiency and use from a single strike typewriter ribbon used in office typewriters. The imported articles are unmistakably more than typewriter ribbons and provide the means of transferring words from a stored memory unit to an office machine printer. The imported articles rapidly produce printed characters upon paper from a specially formulated plastic film ribbon.

In view of the foregoing, it is unnecessary to consider plaintiff's alternative claim for classification as articles of plastic not specially provided for.

The classification of the merchandise as articles of textile materials, not specially provided for, is overruled and the alternative claim by plaintiff for classification under item 676.52, TSUS, as parts of office machines is sustained.

Judgment will be entered accordingly.

SCHEDULE OF
CONSOLIDATED CASES

| Court No. | Plaintiff | Protest No. | Entry No. | Port |
|---|---|---|---|---|
| 79 -8- 01338 | Kores Manufacturing Corp. | 1303–8–000260 | 151114 | Baltimore |
| 79 -8 -01332 | | 28099–000183 | 172335 | San Francisco |
| | | 28099–000496 | 312582 | |
| | | 28099–000488 | 128759 | |
| 79 12 -01954 | | 28099–001568 | 163455 | San Francisco |
| 79 8 01276 | | 1001–8–014518 | 323752 | New York |