APPLE COMPUTER, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Consolidated Court No. 86–01–00125

(Dated February 13, 1990)

*Baker & McKenzie* (*Bruce H. Jackson* and *Jay C. Clemens*), for plaintiff.
*Stuart M. Gerson,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Al J. Daniel, Jr.*), for defendant.

RE, *Chief Judge:* The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from Japan and described on the Customs invoices as "x–y plotters" and "plotter pen kits."

The plotters entered at the port of Oakland, California, in 1983 and 1984, and were classified by the Customs Service as "[d]rafting * * * ma-

---

[10] § **702   Right of review.**
   A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof * * *

chines," under item 710.80 of the Tariff Schedules of the United States (TSUS), with duty assessed at the rate provided for at the time of entry. The plotter pens entered at the port of San Francisco, California, in 1983 and 1984, and were classified by the Customs Service as "[m]arking pens having a wick-like tip of felt or other material," under item 760.15, TSUS, with duty assessed at the rate provided for at the time of entry.

Plaintiff protests these classifications, and contends that the plotters are properly classifiable as "[o]ffice machines not specially provided for," under item 676.30, TSUS, with duty at the rate provided for at the time of entry. Plaintiff also contends that the plotter pens are properly classifiable as "[p]arts of automatic data-processing machines and units thereof," under item 676.52 TSUS, with duty at the rate provided for at the time of entry. Alternatively, plaintiff contends that if the court determines that the plotters were properly classified by the Customs Service as "[d]rafting * * * machines," under item 710.80, TSUS, then the plotter pens are properly classifiable as parts of drafting machines, under item 710.80, TSUS.

The pertinent statutory provisions of the Tariff Schedules are as follows:

*Plotters Classified Under:*

Schedule 7, Part 2, Subpart C:

Drafting machines, compasses, dividers, ruling pens, lettering pens (including fountain-pen type) used by draftsmen, pantographs, drawing curves, rulers, scribers, straight edges, disc calculators, slide rules, and other instruments, all the foregoing which are drawing, marking-out or mathematical calculating instruments; hand styluses; micrometers, calipers, gauges, balancing machines, and non-optical measuring or checking instruments, apparatus, and machines not specially provided for; and parts of the foregoing articles:

     *        *        *        *        *        *        *

Other:

710.80      Drafting and drawing machines, instruments, and apparatus, and parts thereof . . . . . . . . . . . . . . . . . . . . . . . 6.2% *ad val.* (1983)
                                      5.9% *ad. val.* (1984)

*Plotters Claimed Under:*

Schedule 6, Part 4, Subpart G:

676.30      Office machines not specially provided for . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4.4% *ad val.* (1983)
                                        4.2% *ad. val.* (1984)

*Plotter Pens Classified Under:*

> Schedule 7, Part 10:

760.15    Marking pens having a wick-like tip of
            felt or other material  . . . . . . . . . . . . 14.0% *ad val.* (1983)
                                               12.5% *ad val.* (1984)

*Plotter Pens Claimed Under:*

> Schedule 6, Part 4, Subpart G:

Parts of the foregoing:

   *     *     *     *     *     *     *

Other:

   *     *     *     *     *     *     *

676.52    Parts of automatic data-processing ma-
            chines and units thereof . . . . . . . . . . 4.7% *ad val.* (1983)
                                           4.5% *ad. val.* (1984)

*Plotter Pens Alternatively Claimed Under:*

> Schedule 7, Part 2, Subpart C:

Drafting machines, compasses, dividers, ruling pens, lettering pens (including fountain-pen type) used by draftsmen, pantographs, drawing curves, rulers, scribers, straight edges, disc calculators, slide rules, and other instruments, all the foregoing which are drawing, marking-out or mathematical calculating instruments; hand styluses; micrometers, calipers, gauges, balancing machines, and non-optical measuring or checking instruments, apparatus, and machines not specially provide for; and parts of the foregoing articles:

   *     *     *     *     *     *     *

Other:

710.80    Drafting and drawing machines, in-
            struments, and apparatus, and parts
            thereof . . . . . . . . . . . . . . . . . . . . . . . . 6.2% *ad val.* (1983)
                                         5.9% *ad val.* (1984)

Two questions are presented: first, whether the imported plotters have been properly classified by Customs as "[d]rafting * * * machines," under item 710.80, TSUS, or whether they are properly classifiable as "[o]ffice machines not specially provided for," under item 676.30, TSUS, as claimed by plaintiff; second, whether the imported plotter pens have been properly classified by Customs as "[m]arking pens having a wick-like tip of felt or other material," under item 760.15, TSUS, or whether they are properly classifiable as "[p]arts of automatic data-processing machines and units thereof," under item 676.52, TSUS, as claimed by plaintiff.

Alternatively, if the court determines that the plotters have been properly classified as "[d]rafting * * * machines," under item 710.80,

TSUS, the question presented is whether the plotter pens are properly classifiable as parts of drafting machines, under item 710.80, TSUS, as maintained by plaintiff.

In order to decide these questions, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co.* v. *United States,* 733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed. Cir. 1984). Pursuant to 28 U.S.C. § 2639(a)(1) (1982), the government's classification is presumed to be correct, and the burden of proof is upon the party challenging the classification.

After an examination of the merchandise, the pertinent tariff items, relevant case law and the testimony of record, it is the determination of the court that, as to the x–y plotters, plaintiff has overcome the presumption of correctness that attaches to the classification by Customs. Since the plotters are properly classifiable as "[o]ffice machines not specially provided for," under item 676.30, TSUS, plaintiff's protest is sustained.

As to the plotter pens, it is the determination of the court that plaintiff has not overcome the presumption of correctness that attaches to the classification by Customs, and that the plotter pens were properly classified by Customs as "[m]arking pens having a wick-like tip of felt or other material," under item 760.15, TSUS.

### THE PLOTTERS

At trial, in support of its contentions, plaintiff presented the testimony of Mr. Phillip C. Williams, the manager of plaintiff's Developer Technical Support Group. Mr. Williams testified that, prior to his present position with plaintiff, he served as the interface engineering manager of plaintiff's "peripherals" group. Mr. Williams stated that, in this capacity, it was his "responsibility to ensure that the Apple Color Plotter was, one, designed and, two, introduced in the marketplace as a peripheral product that would attach to both the Apple II and Apple III [computers]." He testified that the plotter:

> makes its pictures or follows what the computer tells it to do by simply attaching points together as you might with, say, taking a ruler and laying it down and drawing a line between those. If you have a starting point and an ending point, and draw a line between those two, that is substantially what the plotter does.

Mr. Williams stated that the plotter "[ha]s a number of similar characteristics" with a typical computer dot matrix printer. He explained that:

> [t]he head of the plotter, namely the area where the paper is loaded, is very similar, in that it has a roller drum which is similar to the printer, in that the paper rolls around a drum. The head, itself, is a carrier of marking capability, in that it moves back and forth across a page * * *. The controls, the power switch, all that sort of thing, I think go without saying as similar types of devices. It does have a roller wheel adjustment on the side of the plotter which is similar to

the roller adjuster on the printer[,] [a]nd * * * the marking characteristic capability is very similar, in that we're essentially attaching or impressing paper with ink * * * from the device.

In addition, he noted that "both of these devices * * * are serial devices — which means that information is sent one piece at a time across a pair of wires * * *. The same cable would be used to connect from [a] computer to either one of those two devices * * *." Mr. Williams also stated that the plotter and the dot matrix printer "differ greatly in resolution." He explained that the plotter is "a much higher resolution device in terms of its accuracy * * *."

Mr. Williams stated that plaintiff marketed its plotter principally for use in businesses, to "create overhead transparencies for use in business presentations," and in educational institutions, for "the teaching of children as to how a device would move around in an X,Y plane." Mr. Williams testified that plaintiff had not "very specifically thought of drafting as a true market for th[e] [plotter], given its size limitations and also its speed limitations." He stated that he had no knowledge of any draftsmen or engineers ever purchasing the plotter for use in their profession.

Mr. Williams also testified about computer-aided design (CAD) and computer-aided manufacturing (CAM) systems, which were available at the time of the introduction of the plotter. He explained that:

> [CAD] allowed the individual to do the design in the computer and, then, using the computer's capability, the memory and the speed of the processor, to change that design on the screen, which afforded tremendous leverage in terms of the speed, one, and also the cost associated with the designs themselves. And in the [CAM] area, essentially all of the design characteristics of a particular design that a drafts person would come up with could be translated into manufacturing terms — meaning that I could design a widget or a bolt or a screw, or whatever it was on the screen, specify all of its dimensions, material, and so on, and those terms would then be translated into manufacturing terminology * * *.

Mr. Williams was asked to "compare the products that you were aware of that were being used to create hard copy in the CAD arena with the Apple Color Plotter[.]" He replied that "[m]ost of the output in a CAD environment requires the use of a much larger plotter[,]" with the capacity to produce larger copies of designs than those that could be produced with the Apple plotter. In addition, he stated that the speed of the Hewlett Packard plotter, which was frequently used in CAD and CAM systems, "was approximately ten times that of the Apple Color Plotter." He also stated that typical CAD and CAM output devices had resolution of "one-thousandth of an inch." Mr. Williams stated that, in contrast, the Apple plotter had "approximately four-thousandths of an inch" resolution.

Mr. Williams testified that, in the course of his high school education, he had experience with drafting. He described "drafting" as "[t]he put-

ting of paper and pencil together in such a way that you create some sort of drawing that is meaningful. For example, pictures of a house or articles or electronic circuitry that's depicted on paper * * *." Mr. Williams testified that, during his education, he had used "drafting machines."

In the course of his testimony, Mr. Williams viewed three pamphlets, which were introduced into evidence by plaintiff. The pamphlets contained pictures and descriptions of devices attached to drawing boards. The devices consisted of movable metal structures containing a pair of rulers at right angles. Mr. Williams stated that "[i]n all three instances, even though they are * * * three different models, they are all drafting machines of the type that I used in high school."

Mr. Williams explained that a "drafting machine":

> is what we would call an extension to the average T-square — which was basically two blocks of wood that were affixed perpendicular to one another. This is a mechanical devise that was affixed to a drawing board and allowed the designer to quickly move around on the drawing board and create lines, both vertical and horizontal, as well as being able to create lines that were at angles to the page as well.

Plaintiff also presented a definition of "drafting machine" as "[a] mechanical device to aid in drafting, having two straight edges fixed perpendicularly to each other." *McGraw-Hill Dictionary of Scientific and Technical Terms* 488 (3rd ed. 1984). Mr. Williams testified that this is "an accurate description" of a "drafting machine." He further stated that, to the best of his knowledge, the plotter is not "known commercially" as a "drafting and drawing machine."

On cross examination, Mr. Williams was shown the manual for the Apple plotter. The manual contained a list of drawings that could be made with the plotter, including "Engineering drawings," "Logic diagrams," "Architectural details," and "Circuit diagrams." Mr. Williams identified these drawings as the type of drawings he had done in a drafting course, as part of his high school education. He admitted that the final product of CAD systems "serve the same function to an engineer or for an architect as drawings created by hand with [the type of drafting machine he had used at school]."

Mr. Williams was also questioned about a CAD program called CADAPPLE, which was designed for use with Apple computers. He stated that "I don't recall ever having seen [CADAPPLE] working with the Apple Color Plotter." He admitted, however, that an appropriate CAD program could be used, with the Apple Color Plotter, "to teach students how to do engineering drawings using CAD techniques and programs[.]"

Plaintiff's second witness was Mr. Gary L. Fulcher, president of "Brighter Images," a firm that sells CAD and CAM equipment. Mr. Fulcher testified about the typical use of a CAD system. He explained that usually "[t]he operator would draw * * * on the computer system, and dimension on the computer system, and * * * make changes to the drawing on the computer system, and then would plot it out to some type of a

peripheral device, and usually those peripheral devices were plotters." In response to questioning, Mr. Fulcher agreed that he was "knowledgeable regarding the various [types] of CAD software and hardware that was in the market * * *."

Mr. Fulcher noted that the Apple x–y plotter was "not a product that would have been of much interest to us." He explained that the Apple plotter had "three problems: to[o] small, number one; number two, it's too slow; number three, it's * * * resolution is * * * pretty poor for commercial quality drawings." Mr. Fulcher stated that he had never seen the Apple plotter used in "commercial applications," and that he would not recommend it for commercial use.

Mr. Fulcher testified that he had studied "mechanical drafting, in both high school and in college." He stated that, during his drafting education, he had used the "[s]ame equipment that Mr. Williams used." He identified the instruments in the pamphlets introduced at trial as "drafting machines."

The government, in support of its contention that the imported plotters were properly classified by Customs, introduced the testimony of Mr. Christopher M. Stammen, the director of Development for Computer-aided Drafting Products of Versacad Corporation. The Versacad Corporation sells CAD software. Mr. Stammen, the co-author of a book entitled "CAD Principles and Applications," was qualified "as an expert in programming and CAD software and related equipment used for drafting, including the X,Y plotters."

Mr. Stammen testified that, initially, the CADAPPLE program was not compatible with the Apple plotter. He testified, however, that he devised a "driver," which "converts movement commands [from the CADAPPLE program] to draw lines and arcs into specific Apple Color Plotter commands." Mr. Stammen stated that:

> [i]n my particular work, I would have to have the technical manuals to the plotter in order to write a driver for the * * * CADAPPLE software. I would study the manuals and find the appropriate commands that our CAD software could use to direct it to draw an engineering drawing.

Mr. Stammen testified that CADAPPLE was used by "people dabbling in CAD * * *; small firms who are actually using the CADAPPLE package to do things such as printed circuit board design and layout, small schematic diagrams, fairly simple mechanical drawings." He viewed a promotional mailing to educators, which suggested purchase of the Apple plotter for use with CADAPPLE software.

As part of his testimony, Mr. Stammen demonstrated the use of the Apple plotter with the CADAPPLE software. Using the Apple plotter, Mr. Stammen created a diagram similar to diagrams he had created in a drafting course he had taken as part of his education. Mr. Stammen also observed a set of drafting tools that he had used during his drafting course. He identified several tools which he could use to produce a diagram similar to the one he had made using the Apple plotter.

The government introduced a definition of "drafting" as:

> the act of delineating a drawing of an object, its structure, or its parts in the graphic language universally employed to communicate the engineering intent of a design, or problem. Engineering drawings consist of lines representing surfaces, edges, and contours of objects, supplemented by symbols, dimensional sizes, and notes. In a broad sense, drafting is the graphical development of an engineering problem or record.

5 *The New Encyclopedia Brittanica* 973 (15th ed. 1984). Mr. Stammen agreed with this definition of drafting, and agreed "that what the [Apple] plotter does or creates is a product of drafting[.]" He also stated that, in his opinion, the Apple plotter fell within the language of item 710.80, TSUS.

Plaintiff contends that "the plotters are not classifiable as 'drafting machines' under the *eo nomine* designation for such articles in item 710.80." In support of its contention, plaintiff stressed that "the plotters are not known as 'drafting machines,' " and "do not have the same primary design, construction and function as drafting machines." In contrast, the government contends that the plotters were properly classified as "drafting machines," "because the evidence demonstrates that [they are] machine[s] which [are] an aid to the human creation of mechanical drawings, such as those made by other machines and instruments enumerated in item 710.80, by the manipulation of pens and paper."

In customs law, it is clear that "[t]he meaning of an *eo nomine* designation is determined as of the time of enactment of the tariff act." *Sears, Robuck and Co.* v. *United States,* 46 CCPA 79, 82, C.A.D. 701 (1959). However, while "the meaning of the said designation is thus fixed, that meaning will be held to embrace all articles subsequently created which come within its scope." *Id.* It is also well established that "an *eo nomine* designation includes all forms of the article." *Channel Master, Div. of Avent, Inc.* v. *United States,* 10 CIT 684, 686, 648 F. Supp. 10, 13 (1986), *aff'd,* 856 F.2d 177 (Fed. Cir. 1988).

In *Davies Turner & Co.* v. *United States,* 37 Cust. Ct. 344, 344, Abs. 60191 (1956), *rev'd,* 45 CCPA 39, C.A.D. 669 (1957), the imported merchandise consisted of various types of furniture "bent to shape by the use of machinery." The merchandise was classified by the Customs Service as "bent-wood furniture," under paragraph 412 of the Tariff Act of 1930, as modified. Plaintiff protested the classification, and contended that the merchandise was properly classifiable under provisions for furniture, not specially provided for, under the Tariff Act of 1930.

In Davies Turner, the Customs Court established:

> that, at the time of passage of the Tariff Act of 1930, merchandise such as that in issue, bent by the laminating process, was not known to the trade and commerce of this country; that at the time the common meaning of the term "bent-wood" had application to

furniture made of solid, as distinguished from laminated, wood parts, which parts were bent by steam or hot water * * *.

37 Cust. Ct. at 345. The Customs Court denied plaintiff's protest, and stated that the Act "do[es] not limit the terms 'bent-wood' or 'bent-wood furniture' to articles, the parts or members of which are of solid wood made pliable by steam or hot water." *Id.* at 346.

On appeal, the Court of Customs and Patent Appeals reversed, and stated that "[t]he meaning of *eo nomine* provisions is to be determined as of the date of enactment but, when so determined, that meaning will embrace all subsequently created articles which fall within it." 45 CCPA at 41. The appellate court noted that "the meaning of words used in [tariff] acts is fixed at the time of enactment and does not fluctuate as the meaning of words might subsequently vary." *Id.* at 42. In holding that the laminated bent-wood furniture was not properly classifiable as "bent-wood furniture" under the Tariff Act of 1930, the court observed that:

> we fear we would be ignoring, or at least weakening, the well established doctrine that tariff acts are to be interpreted in light of their meaning at the time of their enactment, if we were to sustain the conclusion below that subsequent changes in meaning of the language used in tariff acts are to prevail in the judicial process of ascertaining Congressional intent.

*Id.* at 43.

In restating the principle, Chief Judge Markey noted that "tariff terms can be expected to encompass merchandise not known to commerce at the time of their enactment, provided the new article possesses an *essential resemblance* to the one named in the statute." *United States* v. *Standard Surplus Sales, Inc.,* 69 CCPA 34, 38, 667 F.2d 1011, 1014 (1981) (emphasis added) (citing *Smillie & Co.* v. *United States,* 12 Ct. Cust. Appls. 365, 367, T.D. 40520 (1924)). *See also Belfont Sales Corp.* v. *United States,* 11 CIT 541, 545, 666 F. Supp. 1568, 1571 (1987), *aff'd,* 878 F.2d 1413 (Fed. Cir. 1989); *Bar Zel Expediters, Inc.* v. *United States,* 3 CIT 84, 101, 544 F. Supp. 868, 881 (1982), *aff'd,* 698 F.2d 1210 (Fed. Cir. 1983). In the present case, the Customs Service classified the imported plotters as "drafting machines." Hence, the court must ascertain and determine whether the Apple plotters bear an "essential resemblance" to the "drafting machines" which existed at the time of the enactment of the TSUS.

In determining whether merchandise invented or that has come into being after the enactment of a tariff act bears an "essential resemblance" to an *eo nomine* item, the courts have looked to similarities in construction, function, or use. *See Standard Surplus Sales,* 69 CCPA at 38–40, 667 F.2d at 1014–1015. It is plain that the imported merchandise bears no similarity in construction to the traditional "drafting machine" described at trial.

The testimony at trial indicated clearly that a traditional "drafting machine," as testified by Mr. Williams, is "a mechanical device that was

affixed to a drawing board and allowed the designer to quickly move around on the drawing board and create lines, both vertical and horizontal, as well as being able to create lines that were at angles to the page as well." This description was corroborated by the pamphlets introduced by plaintiff and which were identified by both of plaintiff's witnesses as pictures and descriptions of "drafting machines." In addition, a "drafting machine" was defined as "[a] mechanical device to aid in drafting, having two straight edges fixed perpendicularly to each other." *McGraw-Hill Dictionary of Scientific and Technical Terms* 488 (3rd ed. 1984). Although the government's expert, Mr. Stammen, described the Apple plotter as a "drawing machine," it is important to note that none of the witnesses at trial identified the plotter as a "drafting machine."

It is often stated that, in customs classification cases, "samples of the merchandise may be 'potent' witnesses." *Permagrain Prods, Inc.* v. *United States,* 9 CIT 426, 429, 623 F. Supp. 1246, 1249 (1985) (citing *Marshall Field & Co.* v. *United States,* 45 CCPA 72, 81, C.A.D. 676 (1958)), *aff'd,* 791 F.2d 914 (Fed. Cir. 1986). In contrast to the mechanical devices defined at trial as "drafting machines," the Apple plotters bear a strong physical resemblance to computer dot matrix printers. In his testimony, Mr. Williams indicated several similarities of the Apple plotter and dot matrix computer printers. More specifically, Mr. Williams identified or described the Apple plotter as an "output device." Mr. Stammen admitted, on cross examination, that, in his firm's literature on the CADAPPLE, plotters and dot matrix printers are identified as "output devices."

Furthermore, the function or use of the Apple plotter differs from the use of traditional "drafting machines." The testimony at trial established that, in using traditional drafting machines, the designer writes by hand on paper placed on a drawing board. In contrast, as Mr. Fulcher testified as to the use of plotters with CAD systems, "[t]he operator would draw * * * on the computer system, and dimension on the computer system, and * * * make changes to the drawing on the computer system, and then would plot it out to * * * [a] plotter[ ]." Mr. Fulcher's testimony was corroborated by the demonstrations at trial by Mr. Williams and Mr. Stammen of the use of the plotter. From the testimony of all the witnesses, it is clear that, while traditional "drafting machines" are used by designers to assist in the creation of hand drawn designs, the Apple plotter serves as a printer for designs created by the designer on a computer. Hence, the Apple plotter and traditional drafting machines have clearly different functions or uses.

In addition, under well established principles of statutory interpretation, it is clear that the Apple plotters are not properly classifiable as "[d]rafting * * * machines," under item 710.80, TSUS. The doctrine of *noscitur a sociis,* i.e., known by its associates, "teach[es] that the meaning of a word may be known or revealed by the words with which it is accompanied or associated." *Economy Cover Corp.* v. *United States,* 76 Cust. Ct. 130, 132, C.D. 4645, 411 F. Supp. 783, 784 (1976). In the head-

ing to item 710.80, TSUS, the term "drafting machines" is followed by "compasses, dividers, ruling pens, lettering pens (including fountain-pen type) used by draftsmen, pantographs, drawing curves, rulers, scribers, straight edges, disc calculators, slide rules, and other instruments, all the foregoing which are drawing, marking-out or mathematical calculating instruments; * * *." The devices listed after "drafting machines" in item 710.80 consist of hand held instruments used in conjunction with the traditional "drafting machines" described at trial, to create designs. Referring to his experiences in drafting as part of his education, Mr. Williams stated that "[c]ompasses were used; dividers were used; ruling pens; lettering pens * * *. Drawing curves certainly were used. Rulers; scribers; straight edges. Slide rules and some of the things down at the bottom; micrometers, calipers, gauges, et cetera, virtually all of them were used in some way." From the demonstrations at trial, it is clear that these devices would serve no purpose in the creation of a design using the Apple plotter.

Plaintiff contends that the Apple plotters are properly classifiable as "[o]ffice machines not specially provided for," under item 676.30, TSUS, "because they are output devices designed for use with computers." In support of its contention, plaintiff cites *Data Prods. Corp.* v. *United States,* 4 CIT 234, 558 F. Supp. 124 (1982).

In *Data Products,* the imported merchandise consisted of parts of line printers, "machine[s] which permit[ ] high speed production of typed matter * * * from computer data sources." 4 CIT at 236, 558 F. Supp. at 126. The merchandise was classified by the Customs Service under item 676.52, TSUS, as parts of office machines. Plaintiff protested the classification and contended that the imported merchandise is properly classifiable under item 668.50, TSUS, as other parts of printing machinery.

The court, in *Data Products,* found "that the sole function of a line printer is to print matter." *Id.* at 237, 558 F. Supp. at 126. The court also found that line printers "are invariably utilized in conjunction with data processing equipment and are, therefore, distinguishable from printing machinery which is used primarily in the graphic arts." *Id.* at 237, 558 F. Supp. at 127. The court determined that "[l]ine printers are thus clearly equipment used peripherally to data processing machines." *Id.* at 239, 558 F. Supp. at 128. Hence, the court held that, since data processing machines are properly classified as office machines, "the importations were properly classified as parts of office machines under item 676.52." *Id.*

In the present case, the testimony at trial indicates certain similarities between the Apple plotters and dot matrix printers similar to the line printers in *Data Products.* The demonstrations of Mr. Williams and Mr. Stammen indicate that, like the line printers, the Apple plotter can only be used in conjunction with a computer. Both devices serve to print designs or information entered into a computer. As Mr. Williams stated during the course of his demonstration, "[t]he plotter's not doing anything more than reacting to a whole series of * * * commands." Mr. Wil-

liams also identified both the Apple plotter and dot matrix printers as "serial devices," and indicated several similarities in design and construction.

Furthermore, headnote 2(a) to schedule 6, part 4, subpart 6, of the TSUS, defines "office machines" as:

> machines which are used in offices, shops, factories, workshops, schools, depots, hotels, and elsewhere, for doing work concerning the writing, recording, sorting, filing, mailing of correspondence, records, accounts, forms, etc., or for doing other "office work", and which have a base for fixing or placing them on a table, desk, wall, floor, or similar place * * *.

The demonstration of Mr. Williams indicated that the Apple plotter can be used to create various types of documents, including graphs or charts. It is clear that these graphs or charts could serve as "correspondence, records, accounts, forms, * * * or * * * other 'office work.' " In addition, the Apple plotter has a base, and can easily be "fix[ed] or plac[ed] * * * on a table, desk, wall, floor, or similar place * * *."

On the record before the court, as to the x–y plotters, it is the holding of the court that plaintiff has overcome the presumption of correctness that attaches to the classification by Customs, and that the imported "x–y plotters" are properly classifiable as "[o]ffice machines not specially provided for," under item 676.30, TSUS.

### The Plotter Pens

Plaintiff introduced at trial a sample of the plotter pens. The pens consist of a small carousel with a rotating head containing four colored tips of felt or a felt-like material. The tips extend from an 11-sided insert that fits into the carousel. When moved across paper, the tips produce lines of ink. Their small size and odd shape, however, render them almost useless for purposes of writing by hand.

Mr. Williams testified that the plotter pens had been designed specifically to function or work with the Apple plotter. He stated that the plotter pens "are unique in the market and cannot be used, by legal agreement with [the manufacturer], on any other plotter in the world." According to Mr. Williams, the pens and carousel "kind of looks like a spaceship."

Plaintiff contends that the plotter pens are not classifiable as "[m]arking pens having a wick-like tip of felt or other material," under item 760.15, TSUS, "because they are 'more than' marking pens." Plaintiff asserts that the plotter pens are properly classifiable as "[p]arts of automatic data-processing machines and units thereof," under item 676.52, TSUS. In contrast, defendant contends that the plotter pens were properly classified by Customs, "because the evidence demonstrates that they are pens which have such tips * * *."

Under General Interpretative Rule 10(ij), "a provision for 'parts' of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part." It is not seriously disputed that the imported plotter pens were solely used as parts

for the Apple plotter. Hence, the question presented is whether the plotter pens are more specifically provided for by item 760.15, TSUS, as "[m]arking pens having a wick-like tip of felt or other material."

In support of its contention, plaintiff cites *Kores Mfg. Corp.* v. *United States,* 3 CIT 178, 545 F. Supp. 1303 (1982). In *Kores,* the imported merchandise consisted of certain film ribbons for word processing machines. The film ribbons were classified by Customs "as other articles not specially provided for, of textile materials under item 389.62 [, TSUS.]" *Id.* at 179, 545 F. Supp. at 1304. Plaintiff protested the classification, and contended that the film ribbons "should have been classified as other articles not specially provided for of plastics under item 774.60, TSUS, * * * [or] under item 676.52, TSUS, as other parts of office machines * * *." *Id.* In addition, the government "submit[ted] as an alternative claim for classification as parts of typewriters, under item 676.50, TSUS * * *."

The court in *Kores* determined that the film ribbons were in chief value of plastic, not of textiles. *See id.* at 188, 545 F. Supp. at 1310. The question presented in *Kores,* was "whether the imported articles are more specifically provided for as claimed by plaintiff as articles not specially provided for of rubber or plastic, or as other parts of office machines under item 676.52, TSUS, or under defendant's alternative claim under item 676.50 as typewriter parts." *Id.* at 188, 545 F. Supp. at 1310–11.

In *Kores,* the court observed that "[t]he record is replete with facts establishing the imported film ribbons are used exclusively in office machines known as printers." *Id.* at 189, 545 F. Supp. at 1312. The court also found that "even though the merchandise may resemble a typewriter ribbon, they are more durable, efficient and suited only to the demands of high velocity printers used in word processing machines." *Id.* at 190, 545 F. Supp. at 1312. Hence, the court determined that the imported film ribbons "are unmistakably *more than* typewriter ribbons * * *." *Id.* at 190, 545 F. Supp. at 1312 (emphasis added). The court sustained plaintiff's protest, and held that the imported film ribbons are properly classifiable as parts of office machines, under item 676.52, TSUS.

In this case, plaintiff asserts that "[l]ike the film ribbons in *Kores,* the Pens are 'more than' marking pens because of their special design, construction, efficiency and use." In determining whether the plotter pens are "more than" pens, "it is necessary to determine the meaning of the tariff provision involved and compare it with the merchandise in issue." *Phone-Mate, Inc.* v. *United States,* 12 CIT 575, 690 F. Supp. 1048, 1053 (1988), *aff'd,* 867 F.2d 1404 (Fed. Cir. 1989).

In customs law, "the common meaning of a tariff term is a question of law and * * * the court may consult dictionaries, scientific authorities, and other reliable information sources to ascertain that common meaning." *C.J. Tower & Sons, Inc.* v. *United States,* 69 CCPA 128, 133, 673 F.2d 1268, 1271 (1982). Neither party has presented any lexicographic

definitions of "pen." The court, however, has found several definitions which are helpful in determining the Congressional intent behind item 760.15, TSUS.

A "pen" has been defined as "any instrument for writing with ink * * *." *The New Century Dictionary of the English Language* 1273 (1946). It has also been defined as "an implement for writing or drawing with ink or a similar fluid * * *." *Webster's Third New International Dictionary* 1668 (1961). Moreover, "to write" has been defined as "to draw or form by or as if by scoring or incising a surface[,] * * *" *Webster's Third New International Dictionary* at 2640, and "to draw" has been defined as "to produce by or as if by tracing a pen or other instrument of delineation over a surface * * *." Id. at 686. According to the Customs Court, a "ball-point pen" is " 'any writing instrument of the type having a reservoir, cartridge, or magazine containing a writing compound or fluid that is fed to a ball type writing device when the instrument is in use.' " *Nightwriter Corp.* v. *United States,* 69 Cust. Ct. 191, 194, C.D. 4393 (1972) (quoting 25 Fed. Reg. 1,777 (March 1, 1960)).

None of the definitions of pen require that the device be able to be grasped by hand to be used to write. Furthermore, the definitions of "to write" and "to draw" do not require action by hand. Hence, the imported plotter pens, despite the fact that they are not suitable for writing by hand, come within the common meaning of "pens."

In addition, it is important to note that item 760.15, TSUS, for '[m]arking pens having a wick-like tip of felt or other material," is an *eo nomine* designation. It cannot be questioned that "an *eo nomine* designation includes all forms of the article." *Channel Master, Div. of Avnet, Inc.* v. *United States,* 10 CIT 684, 686, 648 F. Supp. 10, 13 (1986), *aff'd,* 856 F.2d 177 (Fed. Cir. 1988).

Although the plotter pens do not resemble typical pens, and are not suitable for writing by hand, it cannot be disputed that they serve the same purpose as typical pens, in that they permit the creation of lines of ink on paper. Hence, the plotter pens are not "more than" pens, and were properly classified by Customs as "[m]arking pens having a wick-like tip of felt or other material," under item 760.15, TSUS.

CONCLUSION

In view of the foregoing, it is the determination of the court that, as to the "x–y plotters," plaintiff has rebutted the presumption of correctness that attaches to the classification by Customs, and that they are properly classifiable as "[o]ffice machines not specially provided for," under item 676.30, TSUS.

As to the plotter pens, it is the determination of the court that plaintiff has not overcome the presumption of correctness, and that the plotter pens were properly classified as "[m]arking pens having a wick-like tip of felt or other material," under item 760.15, TSUS. Judgment will issue accordingly.